United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued December 17, 1998 Decided May 14, 1999 

 No. 97-1440

 American Trucking Associations, Inc., et al., 

 Petitioners

 v.

 United States Environmental Protection Agency, 

 Respondent

 Commonwealth of Massachusetts, et al., 

 Intervenors

 Consolidated with 

 Nos. 97-1546, 97-1548, 97-1551, 97-1552, 97-1553, 

 97-1555, 97-1559, 97-1561, 97-1562, 97-1565, 97-1567, 

 97-1571, 97-1573, 97-1574, 97-1576, 97-1578, 97-1579, 

 97-1582, 97-1585, 97-1586, 97-1587, 97-1588, 97-1592, 

 97-1594, 97-1596, 97-1597, 97-1598

 No. 97-1441

 American Trucking Associations, Inc., et al., 

 Petitioners

 v.

 United States Environmental Protection Agency, 

 Respondent

 Commonwealth of Massachusetts, et al., 

 Intervenors

 Consolidated with 

 Nos. 97-1502, 97-1505, 97-1508, 97-1509, 97-1510, 

 97-1512, 97-1513, 97-1514, 97-1518, 97-1519, 97-1526, 

 97-1531, 97-1539, 97-1566, 97-1568, 97-1570, 97-1572, 

 97-1575, 97-1584, 97-1589, 97-1591, 97-1595, 97-1619

 On Petitions for Review of an Order of the 
 Environmental Protection Agency

 F. William Brownell argued the cause for the Non-State 
Clean Air Act Petitioners/Intervenors in 97-1441. With him 
on the briefs were Henry V. Nickel, Edward W. Warren, 
Gary E. Marchant, Robert R. Gasaway, Daniel R. Barney, 
Lynda S. Mounts, Stephen A. Bokat, Robin S. Conrad, 
Dimitri G. (Jim) Daskal, Peter S. Glaser, G. William Frick, 
M. Elizabeth Cox, Jan Amundson, David E. Menotti, Wil-
liam F. Pedersen, Julie C. Becker, Harold P. Quinn, Jr., 
David M. Flannery, L. Poe Leggette, Russell S. Frye, Kathy 
D. Bailey, Roy S. Belden, Cynthia H. Evans, Maurice H. 
McBride, David F. Zoll, Alexandra Dapolito Dunn, Jeffrey 

L. Leiter, Chet M. Thompson, Douglas I. Greenhaus, Grant 
Crandall, Eugene M. Trisko, David M. Friedland, Gary H. 
Baise, Steven F. Hirsch, Erika Z. Jones, Timothy S. Bishop, 
Timothy L. Harker, Thomas J. Graves and James M. Rina-
ca.

 Edward W. Warren argued the cause for Small Business 
Petitioners and Intervenor in 97-1440 and 97-1441. With 
him on the briefs were Daniel R. Barney, Lynda S. Mounts, 
Gary E. Marchant, Robert R. Gasaway, Stephen A. Bokat, 
Robin S. Conrad, Dimitri G. (Jim) Daskal, Jan S. Amund-
son, Henry V. Nickel, F. William Brownell, Ross S. Anton-
son, Jeffrey L. Leiter, Chet M. Thompson, Douglas I. Green-
haus, David M. Friedland, Gary H. Baise, Steven F. Hirsch, 
Erika Z. Jones, Timothy S. Bishop, Barry M. Hartman and 
Leif King.

 Susan E. Ashbrook and Andrew S. Bergman, Assistant 
Attorneys General, State of Ohio, Thomas L. Casey, Solicitor 
General, John C. Scherbarth and Todd B. Adams, Assistant 
Attorneys General, State of Michigan, and Mark J. Rudolph, 
Deputy Chief, State of West Virginia Division of Environmen-
tal Protection, were on the briefs for the State Petitioners in 
97-1440 and 97-1441.

 David J. Kaplan, Attorney, U.S. Department of Justice, 
and Robert G. Dreher, Counsel, U.S. Environmental Protec-
tion Agency, argued the cause for respondent in 97-1441. 
With David J. Kaplan on the brief were Lois J. Schiffer, 
Assistant Attorney General, Alice L. Mattice and Naikang 
Tsao, Attorneys, U.S. Department of Justice, Amey W. Mar-
rella, Michael L. Goo and Gerald K. Gleason, Counsel, U.S. 
Environmental Protection Agency.

 Howard I. Fox argued the cause in 97-1441 and filed the 
briefs in 97-1440 and 97-1441 for intervenor American Lung 
Association. 

 Edward G. Bohlen, Assistant Attorney General, State of 
Massachusetts, Catherine A. Tormey, Deputy Attorney Gen-
eral, State of New Jersey, Kimberly P. Massicotte, Assistant 


Attorney General, State of Connecticut, John H. Hasen, 
Assistant Attorney General, State of Vermont, Jared Snyder 
and Andrew J. Gershon, Assistant Attorneys General, State 
of New York, and Maureen D. Smith, Assistant Attorney 
General, State of New Hampshire, were on the brief for 
intervenor Massachusetts and New Jersey, and amici curiae 
New York, et al. in 97-1441. John M. Looney, Jr., Assistant 
Attorney General, State of Connecticut, entered an appear-
ance.

 C. Boyden Gray and Alan Charles Raul were on the brief 
for Amicus Curiae Congressman Tom Bliley in 97-1441.

 David E. Menotti and William F. Pedersen argued the 
cause for Non-State Petitioners on Fine Particulate Matter 
National Ambient Air Quality Standards in 97-1440. With 
them on the briefs were David H. Kim, Jeffrey A. Knight, 
Daniel R. Barney, Lynda S. Mounts, Steven A. Bokat, Robin 
S. Conrad, Julie Becker, David M. Flannery, L. Poe Leggette, 
Edward W. Warren, Gary E. Marchant, Robert R. Gasaway, 
Dimitri G. Daskal, Harold P. Quinn, Jr., Russell B. Frye, 
Kathy D. Bailey, Cynthia H. Evans, Jan S. Amundson, 
Douglas I. Greenhaus, G. William Frick, M. Elizabeth Cox, 
Victoria A. Cochran, Henry V. Nickel, F. William Brownell, 
Ross S. Antonson, David M. Friedland, Jeffrey L. Leiter, 
Chet M. Thompson, Gary H. Baise, Steven F. Hirsch, Erika 
Z. Jones, Peter S. Glaser, Kurt E. Blase, Timothy S. Bishop, 
Maurice H. McBride, David F. Zoll, Kathryn Smith, 
Christina Franz, Michael A. McCord and James M. Rinaca.

 Robert E. Yuhnke argued the cause for Environmental 
Group and Citizen Petitioners in 97-1440. With him on the 
briefs was David S. Baron.

 Steven J. Burr argued the cause for the Industry Petition-
ers on Coarse Particulate Matter National Ambient Air Quali-
ty Standards in 97-1440. With him on the briefs were 
Harold P. Quinn, Jr., Erika Z. Jones, Timothy S. Bishop and 
Vicki Arroyo Cochran.


 Mary F. Edgar, Attorney, U.S. Department of Justice, and 
Robert G. Dreher, Counsel, U.S. Environmental Protection 
Agency, argued the cause for respondent in 97-1440. With 
Mary F. Edgar on the brief were Lois J. Schiffer, Assistant 
Attorney General, Norman L. Rave, Jr., Naikang Tsao and 
Cecilia E. Kim, Attorneys, U.S. Department of Justice, Ger-
ald K. Gleason and Michael L. Goo, Counsel, U.S. Environ-
mental Protection Agency. Karen L. Egbert, Attorney, U.S. 
Department of Justice, and Amey W. Marrella, Counsel, U.S. 
Environmental Protection Agency, entered appearances.

 Edward G. Bohlen, Assistant Attorney General, State of 
Massachusetts, Catherine A. Tormey, Deputy Attorney Gen-
eral, State of New Jersey, John M. Looney, Jr., Assistant 
Attorney General, State of Connecticut, William H. Sorrell, 
Attorney General, and Ronald A. Shems, Assistant Attorney 
General, State of Vermont, Jared Snyder, Assistant Attorney 
General, State of New York, and Maureen D. Smith, Assis-
tant Attorney General, State of New Hampshire, were on the 
brief for intervenors Massachusetts and New Jersey, and 
amici curiae New York, et al. in 97-1440. Andrew J. Ger-
shon, Assistant Attorney General, State of New York, en-
tered an appearance.

 C. Boyden Gray and Alan Charles Raul were on the brief 
for amicus curiae Senator Orrin Hatch in 97-1440.

 Before: Williams, Ginsburg and Tatel, Circuit Judges.

 Opinion for the Court filed PER CURIAM.1

 Separate opinion dissenting from Part I filed by Circuit 
Judge Tatel.

 PER CURIAM:

 Introduction

 The Clean Air Act requires EPA to promulgate and period-
ically revise national ambient air quality standards 
________

 1Judge Williams wrote Parts I and III.B; Judge Ginsburg wrote 
Parts II, III.A, and IV.D; Judge Tatel wrote Parts IV.A-C. 

("NAAQS") for each air pollutant identified by the agency as 
meeting certain statutory criteria. See Clean Air Act 
ss 108-09, 42 U.S.C. ss 7408-09. For each pollutant, EPA 
sets a "primary standard"--a concentration level "requisite to 
protect the public health" with an "adequate margin of safe-
ty"--and a "secondary standard"--a level "requisite to pro-
tect the public welfare." Id. s 7409(b).

 In July 1997 EPA issued final rules revising the primary 
and secondary NAAQS for particulate matter ("PM") and 
ozone. See National Ambient Air Quality Standards for 
Particulate Matter, 62 Fed. Reg. 38,652 (1997) ("PM Final 
Rule"); National Ambient Air Quality Standards for Ozone, 
62 Fed. Reg. 38,856 (1997) ("Ozone Final Rule"). Numerous 
petitions for review have been filed for each rule.

 In Part I we find that the construction of the Clean Air Act 
on which EPA relied in promulgating the NAAQS at issue 
here effects an unconstitutional delegation of legislative pow-
er. See U.S. Const. art. I, s 1 ("All legislative powers herein 
granted shall be vested in a Congress of the United States."). 
We remand the cases for EPA to develop a construction of 
the act that satisfies this constitutional requirement.

 In Part II we reject the following claims: that s 109(d) of 
the Act allows EPA to consider costs; that EPA should have 
considered the environmental damage likely to result from 
the NAAQS' financial impact on the Abandoned Mine Recla-
mation Fund; that the NAAQS revisions violated the Nation-
al Environmental Policy Act ("NEPA"), Unfunded Mandates 
Reform Act ("UMRA"), and Regulatory Flexibility Act 
("RFA").

 In Part III we decide two ozone-specific statutory issues, 
holding that the 1990 revisions to the Clean Air Act limit 
EPA's ability to enforce new ozone NAAQS and that EPA 
cannot ignore the possible health benefits of ozone.


 Finally, in Part IV we resolve various challenges to the PM 
NAAQS. We agree with petitioners that EPA's choice of 
PM10 as the indicator for coarse particulate matter was 
arbitrary and capricious; we reject petitioners' claims that 
EPA must treat PM2.5 as a "new pollutant," that EPA must 
identify a biological mechanism explaining PM's harmful ef-
fects, and that the Clean Air Act requires secondary NAAQS 
to be set at levels that eliminate all adverse visibility effects.

 The remaining issues cannot be resolved until such time as 
EPA may develop a constitutional construction of the act 
(and, if appropriate, modify the disputed NAAQS in accor-
dance with that construction).

 I. Delegation

 Certain "Small Business Petitioners" argue in each case 
that EPA has construed ss 108 & 109 of the Clean Air Act so 
loosely as to render them unconstitutional delegations of 
legislative power. We agree. Although the factors EPA 
uses in determining the degree of public health concern 
associated with different levels of ozone and PM are reason-
able, EPA appears to have articulated no "intelligible princi-
ple" to channel its application of these factors; nor is one 
apparent from the statute. The nondelegation doctrine re-
quires such a principle. See J.W. Hampton, Jr. & Co. v. 
United States, 276 U.S. 394, 409 (1928). Here it is as though 
Congress commanded EPA to select "big guys," and EPA 
announced that it would evaluate candidates based on height 
and weight, but revealed no cut-off point. The announce-
ment, though sensible in what it does say, is fatally incom-
plete. The reasonable person responds, "How tall? How 
heavy?"

 EPA regards ozone definitely, and PM likely, as non-
threshold pollutants, i.e., ones that have some possibility of 
some adverse health impact (however slight) at any exposure 
level above zero. See Ozone Final Rule, 62 Fed. Reg. at 
38,863/3 ("Nor does it seem possible, in the Administrator's 


judgment, to identify [an ozone concentration] level at which 
it can be concluded with confidence that no 'adverse' effects 
are likely to occur."); National Ambient Air Quality Stan-
dards for Ozone and Particulate Matter, 61 Fed. Reg. 65,637, 
65,651/3 (1996) (proposed rule) ("[T]he single most important 
factor influencing the uncertainty associated with the risk 
estimates is whether or not a threshold concentration exists 
below which PM-associated health risks are not likely to 
occur."). For convenience, we refer to both as non-threshold 
pollutants; the indeterminacy of PM's status does not affect 
EPA's analysis, or ours.

 Thus the only concentration for ozone and PM that is 
utterly risk-free, in the sense of direct health impacts, is zero. 
Section 109(b)(1) says that EPA must set each standard at 
the level "requisite to protect the public health" with an 
"adequate margin of safety." 42 U.S.C. s 7409(b)(1). These 
are also the criteria by which EPA must determine whether a 
revision to existing NAAQS is appropriate. See 42 U.S.C. 
s 7409(d)(1) (EPA shall "promulgate such new standards as 
may be appropriate in accordance with ... [s 7409(b)]"); see 
also infra Part II.A. For EPA to pick any non-zero level it 
must explain the degree of imperfection permitted. The 
factors that EPA has elected to examine for this purpose in 
themselves pose no inherent nondelegation problem. But 
what EPA lacks is any determinate criterion for drawing 
lines. It has failed to state intelligibly how much is too much.

 We begin with the criteria EPA has announced for assess-
ing health effects in setting the NAAQS for non-threshold 
pollutants.1 They are "the nature and severity of the health 

________

 1Technically, EPA describes the criteria as used only for 
setting the "adequate margin of safety." There might be thought 
to be a separate step in which EPA determines what standard 
would protect public health without any margin of safety, and that 
step might be governed by different criteria. But EPA did not use 
such a process, and it need not. See NRDC v. EPA, 902 F.2d 963, 

effects involved, the size of the sensitive population(s) at risk, 
the types of health information available, and the kind and 
degree of uncertainties that must be addressed." Ozone 
Final Rule, 62 Fed. Reg. at 38,883/2; EPA, "Review of the 
National Ambient Air Quality Standards for Particulate Mat-
ter: Policy Assessment of Scientific and Technical Informa-
tion: OAQPS Staff Paper," at II-2 (July 1996) ("PM Staff 
Paper") (listing same factors). Although these criteria, so 
stated, are a bit vague, they do focus the inquiry on pollu-
tion's effects on public health. And most of the vagueness in 
the abstract formulation melts away as EPA applies the 
criteria: EPA basically considers severity of effect, certainty 
of effect, and size of population affected. These criteria, long 
ago approved by the judiciary, see Lead Industries Ass'n v. 
EPA, 647 F.2d 1130, 1161 (D.C. Cir. 1980) ("Lead Indus-
tries"), do not themselves speak to the issue of degree.

 Read in light of these factors, EPA's explanations for its 
decisions amount to assertions that a less stringent standard 
would allow the relevant pollutant to inflict a greater quan-
tum of harm on public health, and that a more stringent 
standard would result in less harm. Such arguments only 
support the intuitive proposition that more pollution will not 
benefit public health, not that keeping pollution at or below 
any particular level is "requisite" or not requisite to "protect 
the public health" with an "adequate margin of safety," the 
formula set out by s 109(b)(1).

 Consider EPA's defense of the 0.08 ppm level of the ozone 
NAAQS. EPA explains that its choice is superior to retain-
ing the existing level, 0.09 ppm, because more people are 
exposed to more serious effects at 0.09 than at 0.08. See 
Ozone Final Rule, 62 Fed. Reg. at 38,868/1. In defending the 
decision not to go down to 0.07, EPA never contradicts the 
intuitive proposition, confirmed by data in its Staff Paper, 
that reducing the standard to that level would bring about 
comparable changes. See EPA, "Review of National Ambient 
Air Quality Standards for Ozone: Assessment of Scientific 

___________________
973 (D.C. Cir. 1990). Thus, the criteria mentioned in the text 
govern the whole standard-setting process. 

and Technical Information: OAQPS Staff Paper," at 156 
(June 1996) ("Ozone Staff Paper"). Instead, it gives three 
other reasons. The principal substantive one is based on the 
criteria just discussed:

 The most certain O3-related effects, while judged to be 
 adverse, are transient and reversible (particularly at O3 
 exposures below 0.08 ppm), and the more serious effects 
 with greater immediate and potential long-term impacts 
 on health are less certain, both as to the percentage of 
 individuals exposed to various concentrations who are 
 likely to experience such effects and as to the long-term 
 medical significance of these effects.

Ozone Final Rule, 62 Fed. Reg. at 38,868/2.

 In other words, effects are less certain and less severe at 
lower levels of exposure. This seems to be nothing more 
than a statement that lower exposure levels are associated 
with lower risk to public health. The dissent argues that in 
setting the standard at 0.08, EPA relied on evidence that 
health effects occurring below that level are "transient and 
reversible," Dissent at 5, evidently assuming that those at 
higher levels are not. But the EPA language quoted above 
does not make the categorical distinction the dissent says it 
does, and it is far from apparent that any health effects 
existing above the level are permanent or irreversible.

 In addition to the assertion quoted above, EPA cited the 
consensus of the Clean Air Scientific Advisory Committee 
("CASAC") that the standard should not be set below 0.08. 
That body gave no specific reasons for its recommendations, 
so the appeal to its authority, also made in defense of other 
standards in the PM Final Rule, see PM Final Rule, 62 Fed. 
Reg. at 38,677/2 (daily fine PM standard); id. at 38,678/3 
(annual coarse PM standard); id. at 38,679/1 (daily coarse PM 
standard), adds no enlightenment. The dissent stresses the 
undisputed eminence of CASAC's members, Dissent at 4, but 
the question whether EPA acted pursuant to lawfully delegat-
ed authority is not a scientific one. Nothing in what CASAC 
says helps us discern an intelligible principle derived by EPA 
from the Clean Air Act.

 Finally, EPA argued that a 0.07 standard would be "closer 
to peak background levels that infrequently occur in some 
areas due to nonanthropogenic sources of O3 precursors, and 
thus more likely to be inappropriately targeted in some areas 
on such sources." Ozone Final Rule, 62 Fed. Reg. at 
38,868/3. But a 0.08 level, of course, is also closer to these 
peak levels than 0.09. The dissent notes that a single back-
ground observation fell between 0.07 and 0.08, and says that 
EPA's decision "ensured that if a region surpasses the ozone 
standard, it will do so because of controllable human activity, 
not uncontrollable natural levels of ozone." Dissent at 6. 
EPA's language, coupled with the data on background ozone 
levels, may add up to a backhanded way of saying that, given 
the national character of the NAAQS, it is inappropriate to 
set a standard below a level that can be achieved throughout 
the country without action affirmatively extracting chemicals 
from nature. That may well be a sound reading of the 
statute, but EPA has not explicitly adopted it.

 EPA frequently defends a decision not to set a standard at 
a lower level on the basis that there is greater uncertainty 
that health effects exist at lower levels than the level of the 
standard. See Ozone Final Rule, 62 Fed. Reg. at 38,868/2; 
PM Final Rule, 62 Fed. Reg. at 38,676/3 (annual fine PM 
standard); id. at 38,677/2 (daily fine PM standard). And such 
an argument is likely implicit in its defense of the coarse PM 
standards. See PM Final Rule, 62 Fed. Reg. at 38,678/3-
79/1. The dissent's defense of the fine particulate matter 
standard cites exactly such a justification. See Dissent at 6 
("The Agency explained that 'there is generally greatest 
statistical confidence in observed associations ... for levels 
at and above the mean concentration [in certain studies]' ") 
(emphasis added in dissent). But the increasing-uncertainty 
argument is helpful only if some principle reveals how much 
uncertainty is too much. None does.

 The arguments EPA offers here show only that EPA is 
applying the stated factors and that larger public health 
harms (including increased probability of such harms) are, as 
expected, associated with higher pollutant concentrations. 
The principle EPA invokes for each increment in stringency 


(such as for adopting the annual coarse particulate matter 
standard that it chose here)--that it is "possible, but not 
certain" that health effects exist at that level, see PM Final 
Rule, 62 Fed. Reg. at 38,678/32--could as easily, for any non-
threshold pollutant, justify a standard of zero. The same 
indeterminacy prevails in EPA's decisions not to pick a still 
more stringent level. For example, EPA's reasons for not 
lowering the ozone standard from 0.08 to 0.07 ppm--that "the 
more serious effects ... are less certain" at the lower levels 
and that the lower levels are "closer to peak background 
levels," see Ozone Final Rule, 62 Fed. Reg. at 38,868/2--could 
also be employed to justify a refusal to reduce levels below 
those associated with London's "Killer Fog" of 1952. In that 
calamity, very high PM levels (up to 2,500 Sg/m3) are believed 
to have led to 4,000 excess deaths in a week.3 Thus, the 
agency rightly recognizes that the question is one of degree, 
but offers no intelligible principle by which to identify a 
stopping point.

 The latitude EPA claims here seems even broader than 
that OSHA asserted in International Union, UAW v. OSHA 
("Lockout/Tagout I"), 938 F.2d 1310, 1317 (D.C. Cir. 1991), 
which was to set a standard that would reduce a substantial 
risk and that was not infeasible. In that case, OSHA thought 
itself free either to "do nothing at all" or to "require precau-
tions that take the industry to the brink of ruin," with "all 
positions in between ... evidently equally valid." Id. Here, 
EPA's freedom of movement between the poles is equally 
unconstrained, but the poles are even farther apart--the 
maximum stringency would send industry not just to the 

________

 2EPA did cite qualitative evidence for further support for its 
annual standard, and argued that the evidence "does not provide 
evidence of effects below the range of 40-50 Sg/m3," the standard 
level. PM Final Rule, 62 Fed. Reg. at 38,678/3. The referenced 
document, however, bears no indication that the qualitative evidence 
demonstrates effects at the level of the standard, either. See EPA, 
"Air Quality Criteria for Particulate Matter," at 13-79 (April 1996). 

 3See W.P.D. Logan, "Mortality in the London Fog Incident, 
1952," The Lancet, Feb. 4, 1953, at 336-38. 

brink of ruin but hurtling over it, while the minimum strin-
gency may be close to doing nothing at all.

 In Lockout/Tagout I certain special conditions that have 
justified an exceptionally relaxed application of the nondele-
gation doctrine were absent, id. at 1317-18, and they are 
equally absent here. The standards in question affect the 
whole economy, requiring a "more precise" delegation than 
would otherwise be the case, see A.L.A. Schechter Poultry 
Corp. v. United States, 295 U.S. 495, 553 (1935). No "special 
theories" justifying vague delegation such as the war powers 
of the President or the sovereign attributes of the delegatee 
have been or could be asserted. Nor is there some inherent 
characteristic of the field that bars development of a far more 
determinate basis for decision. (This is not to deny that 
there are difficulties; we consider some below.)

 EPA cites prior decisions of this Court holding that when 
there is uncertainty about the health effects of concentrations 
of a particular pollutant within a particular range, EPA may 
use its discretion to make the "policy judgment" to set the 
standards at one point within the relevant range rather than 
another. NRDC v. EPA, 902 F.2d 962, 969 (D.C. Cir. 1990); 
American Petroleum Inst. v. Costle, 665 F.2d 1176, 1185 
(D.C. Cir. 1981); Lead Industries, 647 F.2d at 1161 (D.C. Cir. 
1980). We agree. But none of those panels addressed the 
claim of undue delegation that we face here, and accordingly 
had no occasion to ask EPA for coherence (for a "principle," 
to use the classic term) in making its "policy judgment." The 
latter phrase is not, after all, a self-sufficient justification for 
every refusal to define limits.

 It was suggested at oral argument that EPA's vision of its 
discretion in application of s 109(b)(1) is no broader than that 
asserted by OSHA after a remand by this court and upheld 
by this court in International Union, UAW v. OSHA ("Lock-
out/Tagout II"), 37 F.3d 665 (D.C. Cir. 1994). But there, in 
fact, OSHA allowed itself to set only standards falling some-
where between maximum feasible stringency and some "mod-
erate" departure from that level. Id. at 669. As our prior 
discussion should have indicated, here EPA's formulation of 


its policy judgment leaves it free to pick any point between 
zero and a hair below the concentrations yielding London's 
Killer Fog.

 The dissent argues that a nondelegation challenge similar 
to this one was rejected in South Terminal Corp. v. EPA, 504 
F.2d 646 (1st Cir. 1974), and cites that case's language that 
"the rationality of the means can be tested against goals 
capable of fairly precise definition in the language of science," 
id. at 677. See Dissent at 2. But the action challenged in 
South Terminal was EPA's adoption of a plan for ending or 
preventing violations in Boston of already-established 
NAAQS, not its promulgation of the NAAQS themselves. 
Thus, it seems likely that the "means" were the plan's provi-
sions--e.g., a prohibition on most new parking in the city, see 
504 F.2d at 671, and the "fairly precise[ly] defin[ed]" goals 
were the NAAQS themselves.

 Where (as here) statutory language and an existing agency 
interpretation involve an unconstitutional delegation of power, 
but an interpretation without the constitutional weakness is 
or may be available, our response is not to strike down the 
statute but to give the agency an opportunity to extract a 
determinate standard on its own. Lockout/Tagout I, 938 F.2d 
at 1313. Doing so serves at least two of three basic rationales 
for the nondelegation doctrine. If the agency develops deter-
minate, binding standards for itself, it is less likely to exercise 
the delegated authority arbitrarily. See Amalgamated Meat 
Cutters v. Connally, 337 F. Supp. 737, 758-59 (D.D.C. 1971) 
(Leventhal, J., for three-judge panel). And such standards 
enhance the likelihood that meaningful judicial review will 
prove feasible. See id. at 759. A remand of this sort of 
course does not serve the third key function of non-delegation 
doctrine, to "ensure[ ] to the extent consistent with orderly 
governmental administration that important choices of social 
policy are made by Congress, the branch of our Government 
most responsive to the popular will," Industrial Union Dep't, 
AFL-CIO v. American Petroleum Inst., 448 U.S. 607, 685 
(1980) ("Benzene") (Rehnquist, J., concurring). The agency 
will make the fundamental policy choices. But the remand 
does ensure that the courts not hold unconstitutional a statute 


that an agency, with the application of its special expertise, 
could salvage. In any event, we do not read current Supreme 
Court cases as applying the strong form of the nondelegation 
doctrine voiced in Justice Rehnquist's concurrence. See Mis-
tretta v. United States, 488 U.S. 361, 377-79 (1989).

 What sorts of "intelligible principles" might EPA adopt? 
Cost-benefit analysis, mentioned as a possibility in Lock-
out/Tagout I, 938 F.2d at 1319-21, is not available under 
decisions of this court. Our cases read s 109(b)(1) as barring 
EPA from considering any factor other than "health effects 
relating to pollutants in the air." NRDC, 902 F.2d at 973; 
see also Lead Industries, 647 F.2d at 1148; American Lung 
Ass'n v. EPA, 134 F.3d 388, 389 (D.C. Cir. 1998); American 
Petroleum Inst., 665 F.2d at 1185 (echoing the same themes).

 In theory, EPA could make its criterion the eradication of 
any hint of direct health risk. This approach is certainly 
determinate enough, but it appears that it would require the 
agency to set the permissible levels of both pollutants here at 
zero. No party here appears to advocate this solution, and 
EPA appears to show no inclination to adopt it.4

 EPA's past behavior suggests some readiness to adopt 
standards that leave non-zero residual risk. For example, it 
has employed commonly used clinical criteria to determine 
what qualifies as an adverse health effect. See Ozone Staff 
________

 4A zero-risk policy might seem to imply de-industrialization, 
but in fact even that seems inadequate to the task (and even if the 
calculus is confined to direct risks from pollutants, as opposed to 
risks from the concomitant poverty). First, PM (at least) results 
from almost all combustion, so only total prohibition of fire or 
universal application of some heretofore unknown control technolo-
gy would reduce manmade emissions to zero. See PM Staff Paper 
at IV-1. Second, the combustion associated with pastoral life 
appears to be rather deadly. See World Bank, World Development 
Report 1992: Development and the Environment 52 (1992) (noting 
that "biomass" fuels (i.e., wood, straw, or dung) are often the only 
fuels that "poor households, mostly in rural areas" can obtain or 
afford, and that indoor smoke from biomass burning "contributes to 
acute respiratory infections that cause an estimated 4 million deaths 
annually among infants and children."). 

Paper at 59-60 (using American Thoracic Society standards 
to determine threshold for "adverse health effect" from 
ozone). On the issue of likelihood, for some purposes it might 
be appropriate to use standards drawn from other areas of 
the law, such as the familiar "more probable than not" 
criterion.

 Of course a one-size-fits-all criterion of probability would 
make little sense. There is no reason why the same probabil-
ity should govern assessments of a risk of thousands of 
deaths as against risks of a handful of people suffering 
momentary shortness of breath. More generally, all the 
relevant variables seem to range continuously from high to 
low: the possible effects of pollutants vary from death to 
trivialities, and the size of the affected population, the proba-
bility of an effect, and the associated uncertainty range from 
"large" numbers of persons with point estimates of high 
probability, to small numbers and vague ranges of probabili-
ty. This does not seem insurmountable. Everyday life com-
pels us all to make decisions balancing remote but severe 
harms against a probability distribution of benefits; people 
decide whether to proceed with an operation that carries a 
1/1000 possibility of death, and (simplifying) a 90% chance of 
cure and a 10% chance of no effect, and a certainty of some 
short-term pain and nuisance. To be sure, all that requires is 
a go/no-go decision, while a serious effort at coherence under 
s 109(b)(1) would need to be more comprehensive. For 
example, a range of ailments short of death might need to be 
assigned weights. Nonetheless, an agency wielding the pow-
er over American life possessed by EPA should be capable of 
developing the rough equivalent of a generic unit of harm 
that takes into account population affected, severity and 
probability. Possible building blocks for such a principled 
structure might be found in the approach Oregon used in 
devising its health plan for the poor. In determining what 
conditions would be eligible for treatment under its version of 
Medicaid, Oregon ranked treatments by the amount of im-
provement in "Quality-Adjusted Life Years" provided by each 


treatment, divided by the cost of the treatment.5 Here, of
 course, EPA may not consider cost, and indeed may well find 
________

 5The "quality" of various health states was determined by poll, 
and medical professionals determined the probabilities and dura-
tions of various health states with and without the treatment in 
question.

 Oregon was twice forced to revise its system because the United 
States Department of Health & Human Services determined that 
the original proposal and a revision violated the Americans with 
Disabilities Act, 42 U.S.C. ss 12101-12213. The reason given for 
this determination was that both versions undervalued the lives of 
persons with disabilities: The original plan measured quality of life 
according to the attitudes of the general population rather than the 
attitudes of persons with disabilities. See HHS, "Analysis Under 
the Americans with Disabilities Act ('ADA') of the Oregon Reform 
Demonstration" (Aug. 3, 1992), reprinted in 9 Issues in L. & Med. 
397, 410, 410 (1994). The revised plan ranked treatments leaving 
the patient in a "symptomatic" state lower than those leaving the 
patient asymptomatic, and certain disabling conditions were consid-
ered "symptoms." See Letter from Timothy B. Flanagan, Assistant 
Attorney General, to Susan K. Zagame, Acting General Counsel, 
HHS (Jan. 19, 1993), reprinted in 9 Issues in L. & Med. 397, 418, 
421 (1994). The Department's determination was extensively criti-
cized when issued. See Maxwell J. Mehlman et al., "When Do 
Health Care Decisions Discriminate Against Persons with Disabili-
ties?" 22 J. Of Health Politics, Policy & L. 1385, 1390 (1997) 
(HHS's "decision provoked a storm of disbelief and denunciation").

 We take no position on whether HHS's view was correct, or if the 
underlying norm also governs EPA's decisions under s 109(b)(1). 
An affirmative answer, however, would not seem to preclude use of 
some of Oregon's approach. The first step would be giving appro-
priate weight to the views of persons with disabilities. The second 
might be measuring the seriousness of a pollution-induced health 
effect by the absolute level of well-being that the effect brings 
about, not by the decrease in level that the effect causes. In other 
words, if the maximum well-being level is 100 and the average 
asthmatic whose asthma constitutes a disability has a well-being of 
80 in the absence of air pollution (according to a measure that 
appropriately considers asthmatics' own assessments of their condi-

a completely different method for securing reasonable coher-
ence. Alternatively, if EPA concludes that there is no princi-
ple available, it can so report to the Congress, along with such 
rationales as it has for the levels it chose, and seek legislation 
ratifying its choice.

 We have discussed only the primary standards. Because 
the secondary standards are at least in part based on those, 
see Ozone Final Rule, 62 Fed. Reg. at 38,875/3-76/1; PM 
Final Rule, 62 Fed. Reg. at 38,680/3, we also remand the 
cases to the agency with regard to the secondary standards 
as well, for further consideration in light of this opinion.

 II. Other General Claims

 The petitioners and amici contend that the EPA erroneous-
ly failed to consider a host of factors in revising the PM and 
ozone NAAQS. We reject each of these claims in turn.

A.Consideration of Cost in Revising Standards
 As this court long ago made clear, in setting NAAQS under 
s 109(b) of the Clean Air Act, the EPA is not permitted to 
consider the cost of implementing those standards. See Lead 
Industries, 647 F.2d at 1148 (D.C. Cir. 1980); see also NRDC, 
902 F.2d at 973 (following Lead Industries in reviewing 
particulate matter NAAQS); American Petroleum Inst., 665 
F.2d at 1185 (same, in reviewing ozone NAAQS). The peti-
tioners make four unsuccessful attempts to distinguish Lead 
Industries and its progeny.

 First, the petitioners claim that in Lead Industries we held 
only that the Clean Air Act does not compel the EPA to 
consider the costs of implementation in setting a NAAQS; on 
the contrary, we held that the Act precludes the EPA from 
doing so. See Lead Industries, 647 F.2d at 1148 ("the statute 
___________________
tion), then a response to air pollution that reduces the asthmatics' 
well-being to 70 could be counted as an effect of magnitude 30 (the 
difference from full health), rather than 10 (the difference from the 
level without the pollution). That approach would ensure that 
effects on persons with disabilities were not underestimated, even in 
the broad sense of that term apparently adopted by HHS. 

and its legislative history make clear that economic consider-
ations play no part in the promulgation of [NAAQS]").

 Second, that we decided Lead Industries prior to the 
Supreme Court's decision in Chevron U.S.A. Inc. v. NRDC, 
467 U.S. 837 (1984) does not, as the petitioners suggest, 
require us to revisit the earlier case. The Lead Industries 
decision was made in Chevron step one terms, see id., as the 
post-Chevron progeny of Lead Industries have made clear. 
See NRDC, 902 F.2d at 973 ("Consideration of costs ... 
would be flatly inconsistent with the statute, legislative histo-
ry and case law on this point"); NRDC v. EPA, 824 F.2d 
1146, 1158C59 (D.C. Cir. 1987) (in banc) ("Vinyl Chloride") 
("[S]tatute on its face does not allow consideration of techno-
logical or economic feasibility.... Congress considered the 
alternatives and chose to close down sources or even indus-
tries rather than to allow risks to health").

 Third, though the petitioners are correct that in Lead 
Industries we interpreted s 109(b), which governs the setting 
of NAAQS, and not s 109(d), which governs the revising of 
NAAQS, we can discern no legally relevant difference in the 
two sections that would make Lead Industries inapplicable to 
s 109(d). Section 109(d)(1) directs the EPA to:

 complete a thorough review of the criteria published 
 under section 7408 of this title and the [NAAQS] promul-
 gated under this section and [to] make such revisions in 
 such criteria and standards and promulgate such new 
 standards as may be appropriate in accordance with 
 section 7408 of this title and subsection (b) of this section.

42 U.S.C. s 7409(d)(1). The petitioners contend that consid-
eration of costs is one pertinent factor in determining wheth-
er revision of a NAAQS is "appropriate," but this argument 
ignores the clause immediately following "appropriate," which 
incorporates s 109(b) and thereby affirmatively precludes 
consideration of costs in revising NAAQS. Section 108(b), 42 
U.S.C. s 7408(b), does require the EPA to provide the States 
with information on the cost of implementing NAAQS, but the 
reference to s 108 does not permit consideration of costs in 
setting NAAQS because it clearly relates back to the require-


ment that the EPA "make ... revisions in ["the criteria 
published under section 7408"] ... as may be appropriate." 
And insofar as the air quality criteria do apply to the setting 
of NAAQS, they do so through s 109(b), which (again) pre-
cludes the consideration of costs and which is explicitly 
incorporated into s 109(d)(1). See id. s 7409(b)(1) (primary 
NAAQS to be "based on [the air quality] criteria" issued 
under s 108).

 Fourth, the petitioners point to s 109(d)(2), which creates 
the CASAC and requires it to advise the EPA about, among 
other things, "any adverse public health, welfare, social, eco-
nomic, or energy effects which may result from various 
strategies for attainment and maintenance of such [NAAQS]." 
Id. s 7409(d)(2)(C)(iv). Why, ask the petitioners, would the 
CASAC be required to advise the EPA about these matters if 
the EPA were not then supposed to consider its advice in the 
course of revising the NAAQS? As above, however, the 
petitioners overlook that s 109(d)(1) directs the EPA to re-
view and to revise, as appropriate, the air quality standards 
issued under s 108 as well as the NAAQS promulgated under 
s 109(b). The advice required in s 109(d)(2)(C)(iv) is perti-
nent only to the EPA's duty under s 108 to provide the 
States with control strategy information.

B.Environmental Consequences of Implementing 
 NAAQS

 The State Petitioners argue that the EPA erred in failing 
"to consider the environmental consequences resulting from 
the financial impact of the [revised PM2.5 and ozone NAAQS] 
on the federal Abandoned Mine Reclamation Fund Act." 
This argument is squarely foreclosed by our decision in 
NRDC. In reviewing the EPA's previous revision of the PM 
NAAQS, we rejected the argument that the EPA "erred in 
refusing to consider the health consequences of unemploy-
ment in determining the primary [NAAQS] for particulate 
matter" and held that "[i]t is only health effects relating to 
pollutants in the air that EPA may consider." 902 F.2d at 
972-73 (emphasis in original). Unlike the positive health 
benefits of ozone that we hold (in Part III.B, below) the EPA 


must consider, any detrimental health effects resulting from 
the financial impact upon the mine fund, like the health 
consequences of unemployment, are traceable to the cost of 
complying with the revised PM2.5 and ozone NAAQS and not 
to the presence of those pollutants in the air.

C.The National Environmental Policy Act

 In challenging both the revised PM2.5 and ozone NAAQS, 
the State Petitioners also argue that the EPA failed to 
comply with certain requirements of the NEPA. The peti-
tioners recognize that the Congress has exempted all actions 
under the Clean Air Act, including the setting of NAAQS, 
from the central requirement of the NEPA, namely, the 
preparation of an Environmental Impact Statement. Com-
pare 42 U.S.C. s 4332(2)(C)-(D) (agency must prepare EIS 
in all "major Federal actions significantly affecting the quality 
of the human environment"), with 15 U.S.C. s 793(c)(1) ("No 
action taken under the Clean Air Act shall be deemed a major 
Federal action significantly affecting the quality of the human 
environment within the meaning of the [NEPA]"). Nonethe-
less, they suggest that the EPA is required to complete the 
functional equivalent of an EIS and also to comply with other 
requirements in the NEPA, see 42 U.S.C. s 4332(2)(B), (E), 
(G). State Petitioners' PM Brief at 20; State Petitioners' 
Ozone Brief at 19. We reject each of these suggestions.

 First, the State Petitioners contend that this court has 
"recognized that the '[CAA], properly construed, requires the 
functional equivalent of a NEPA impact statement,' " id. 
(quoting Portland Cement Ass'n v. Ruckelshaus, 486 F.2d 
375, 384 (1973)). Our decision in Portland Cement, however, 
actually construed only "section 111 of the Clean Air Act." 
By replacing these words with "[CAA]" in their briefs, the 
petitioners misrepresent our interpretation of a single section 
of the Clean Air Act, dealing with emission standards for 
stationary sources, as an interpretation of the entire Act. 
Even if the petitioners were correct, however, Portland Ce-


ment predated, and is now superseded by, the statutory 
exemption in 15 U.S.C. s 793(c)(1), which the Congress added 
in 1974.

 Second, the State Petitioners contend that a provision of 
the NEPA "requires that EPA weigh 'economic consider-
ations.' " The section to which the petitioners refer reads as 
follows: "all agencies of the Federal Government shall ... 
identify and develop methods and procedures ... which will 
insure that presently unquantified environmental amenities 
and values may be given appropriate consideration in deci-
sionmaking along with economic and technical consider-
ations." 42 U.S.C. s 4332(2)(B). Even if this section is 
properly read generally to require an agency to consider 
implementation costs, s 109(d)(1) specifically prohibits the 
EPA from doing so. And the NEPA provides that it shall not 
"in any way affect the specific statutory obligations of any 
Federal agency ... to comply with criteria or standards of 
environmental quality." 42 U.S.C. s 4334(1). Therefore, 
s 4332(2)(B) cannot require the EPA to disregard the prohi-
bition in s 109(d)(1) upon the consideration of costs in setting 
NAAQS.

 The State Petitioners' remaining arguments--that the EPA 
failed to comply with two other sections of the NEPA--fare 
little better. Section 4332(2)(E) requires federal agencies to 
"study, develop, and describe appropriate alternatives to rec-
ommended courses of action in any proposal which involves 
unresolved conflicts concerning alternative uses of available 
resources." As with s 4332(2)(B), insofar as s 4332(2)(E) can 
be read to require the EPA to consider the costs of imple-
menting NAAQS when revising those standards, contrary to 
the prohibition in s 109(d)(1), s 4334(1) prevents it from 
having any effect.

 If, on the other hand, s 4332(2)(E) is understood in the 
context of the Clean Air Act to require the EPA merely to 
discuss implementation alternatives, then it, like the similar 
s 4332(2)(G) with which the petitioners also claim the EPA 
failed to comply, is the functional equivalent of s 108(b)(1). 
That section requires the EPA to provide the States with, 
among other things, "such data as are available on available 


technology and alternative methods of prevention and control 
of air pollution." As we recognize with regard to the require-
ment that the agency prepare an EIS, "[c]ompliance with 
NEPA's ... requirement[s] has not been considered neces-
sary when the agency's organic legislation mandates proce-
dures for considering the environment that are 'functional 
equivalents' of the [NEPA's] process." Izaak Walton League 
of Am. v. Marsh, 655 F.2d 346, 367 n.51 (1981). The rationale 
for the functional equivalence doctrine is the well-established 
principle that a "general statutory rule usually does not 
govern unless there is no more specific rule." Green v. Bock 
Laundry Mach. Co., 490 U.S. 504, 524 (1989); see also 
Alabama ex rel. Siegelman v. EPA, 911 F.2d 499, 504-05 
(11th Cir. 1990) (citing cases). The NEPA is the general 
statute requiring agencies to consider environmental harms, 
whereas the Clean Air Act is the more specific and its 
equivalent provisions apply in place of those in the NEPA. 
See Portland Cement, 486 F.2d at 386 (finding functional 
equivalence when more specific statute strikes "workable 
balance between some of the advantages and disadvantages of 
full application of NEPA").

 Our analysis of the petitioners' contentions leads us to 
conclude that nothing in the NEPA requires the EPA in 
setting NAAQS to consider or to discuss matters that the 
Clean Air Act does not already permit or require.

 D. The Unfunded Mandates Reform Act

 The State Petitioners in the particulate matter case and 
Congressman Bliley in the ozone case both contend that the 
EPA is required by the Unfunded Mandates Reform Act, 2 
U.S.C. s 1501 et seq., to prepare a Regulatory Impact State-
ment (RIS) when setting a NAAQS, see id. s 1532, and to 
choose the least burdensome from a range of alternative 
permissible NAAQS, see id. s 1535. Even if the petitioners 
and the amicus are correct regarding the interaction of the 
UMRA and the CAA--a point the EPA strongly contests--
we can provide them with no relief. See id. s 1571(a)(3) 
("[T]he inadequacy or failure to prepare [a RIS] ... shall not 
be used as a basis for staying, enjoining, invalidating or 


otherwise affecting [an] agency rule"); id. s 1571(b) ("Except 
as provided in [s 1571(a), which does not mention s 1535,] 
... any compliance or noncompliance with the provisions of 
this chapter ... shall not be subject to judicial review; and 
no provision of this chapter shall be construed to [be] ... 
enforceable by any person in any ... judicial action").

 The State Petitioners, recognizing the limitations upon 
judicial review in s 1571, contend that the EPA's failure to 
prepare a RIS can nonetheless render the NAAQS arbitrary 
and capricious, see 42 U.S.C. s 7607(d)(9), relying upon 
Thompson v. Clark, 741 F.2d 401 (D.C. Cir. 1984). In that 
case, we interpreted a statute that, like the UMRA, both 
specified that the RIS be included in the record for judicial 
review and precluded judicial review of an agency's compli-
ance with the RIS requirement. We held that a "reviewing 
court will consider the contents of the [RIS], along with the 
rest of the record, in assessing not the agency's compliance 
with the [requirement to prepare the RIS], but the validity of 
the rule under other provisions of law." Id. at 405. No 
information in a RIS, however, could lead us to conclude that 
the EPA improperly set the PM and ozone NAAQS; the only 
information such a statement would add to the rulemaking 
record for a NAAQS would pertain to the costs of implemen-
tation, see 2 U.S.C. s 1532(a), and the EPA is precluded from 
considering those costs in setting a NAAQS. Accordingly, 
the failure to prepare a RIS does not render the NAAQS 
arbitrary and capricious.

E.The Regulatory Flexibility Act

 In both the ozone and particulate matter cases, the Small 
Business Petitioners argue that the EPA improperly certified 
that the revised NAAQS would not have a significant impact 
upon a substantial number of small entities. The Regulatory 
Flexibility Act, 5 U.S.C. s 601 et seq., as amended in 1996 by 
the Small Business Regulatory Enforcement Fairness Act, 
Pub. L. No. 104-121, tit. II, 110 Stat. 857-74 ("SBREFA"), 
requires an agency, when engaging in notice and comment 
rulemaking, to "prepare and make available for public com-
ment an initial regulatory flexibility analysis.... [that] de-


scribe[s] the impact of the proposed rule on small entities," 5 
U.S.C. s 603(a), including small businesses, small organiza-
tions, and small governmental jurisdictions, see id. s 601(6). 
When promulgating a final rule, an agency must describe "the 
steps ... taken to minimize the significant economic impact 
on small entities." Id. s 604(a)(5). According to the petition-
ers, if the EPA had complied with the RFA, it would likely 
have promulgated less stringent PM and ozone NAAQS than 
those actually chosen, which would have reduced the burden 
upon small entities.

 A regulatory flexibility analysis is not required, however, if 
the agency "certifies that the rule will not, if promulgated, 
have a significant economic impact on a substantial number of 
small entities." Id. s 605(b). Further, the SBREFA made 
no change in the requirement that a regulatory flexibility 
analysis conducted pursuant to the RFA include estimates of 
"the number of small entities to which the proposed rule will 
apply" and of "the classes of small entities which will be 
subject to the requirement." 5 U.S.C. s 603(b)(3)-(4). We 
have consistently interpreted the RFA, based upon these 
sections, to impose no obligation upon an agency "to conduct 
a small entity impact analysis of effects on entities which it 
does not regulate." Motor & Equip. Mfrs. Ass'n v. Nichols, 
142 F.3d 449, 467 & n.18 (1998).

 The EPA certified that its revised NAAQS will "not have a 
significant economic impact on small entities within the mean-
ing of the RFA." PM Final Rule, 62 Fed. Reg. at 38,702/2; 
Ozone Final Rule, 62 Fed. Reg. at 38,887/2-3. According to 
the EPA, the NAAQS themselves impose no regulations upon 
small entities. Instead, the several States regulate small 
entities through the state implementation plans (SIPs) that 
they are required by the Clean Air Act to develop. See 42 
U.S.C. s 7410. Because the NAAQS therefore regulate small 
entities only indirectly--that is, insofar as they affect the 
planning decisions of the States--the EPA concluded that 
small entities are not "subject to the proposed regulation." 
See Mid-Tex Elec. Coop., Inc. v. FERC, 773 F.2d 327, 342 
(D.C. Cir. 1985); see also id. at 343 ("Congress did not intend 
to require that every agency consider every indirect effect 


that any regulation might have on small businesses in any 
stratum of the national economy.").

 The EPA's description of the relationship between NAAQS, 
SIPs, and small entities strikes us as incontestable. The 
States have broad discretion in determining the manner in 
which they will achieve compliance with the NAAQS. The 
EPA "is required to approve a state plan which provides for 
the timely attainment and subsequent maintenance of am-
bient air standards" and cannot reject a SIP based upon its 
view of "the wisdom of a State's choices of emission limita-
tions," Train v. NRDC, 421 U.S. 60, 79 (1975) (emphasis in 
original), or of the technological infeasibility of the plan. See 
Union Elec. Co. v. EPA, 427 U.S. 246, 265 (1976). Therefore, 
a State may, if it chooses, avoid imposing upon small entities 
any of the burdens of complying with a revised NAAQS. 
Only if a State does not submit a SIP that complies with 
s 110, 42 U.S.C. s 7410, must the EPA adopt an implementa-
tion plan of its own, which would require the EPA to decide 
what burdens small entities should bear. The agency has 
stated, however, that it will do a regulatory flexibility analysis 
before adopting an implementation plan of its own, as it did in 
1994 when proposing such a plan for Los Angeles. See 
Ozone Final Rule, 62 Fed. Reg. at 38,891/1; PM Final Rule, 
62 Fed. Reg. at 38,705/3.

 The responses of the Small Business Petitioners do not 
persuade us to reject the EPA's argument or to deviate from 
our holdings in Mid-Tex and its progeny. First, the Small 
Business Petitioners contend that we must defer to the Small 
Business Administration's interpretation of the Act, as ex-
pressed in a letter to the EPA from the SBA's Chief Counsel 
for Advocacy, that the NAAQS do impose requirements upon 
small entities. The SBA, however, neither administers nor 
has any policymaking role under the RFA; at most its role is 
advisory. See, e.g., 5 U.S.C. ss 601(3), 602(b), 603(a), 605(b), 
609(b)(1), 612. Therefore, we do not defer to the SBA's 
interpretation of the RFA. See Scheduled Airlines Traffic 
Offices, Inc. v. Department of Defense, 87 F.3d 1356, 1361 
(D.C. Cir. 1996) (no Chevron deference owed to agency 
interpretation of statute it does not administer). Nor do we 


defer to the EPA's interpretation of the RFA, for it does not 
administer the Act either. We do, however, find the EPA's 
interpretation of the statute persuasive.

 Second, the Small Business Petitioners argue that the EPA 
cannot claim both that the NAAQS will have no effect upon 
small entities and that it will have positive health effects. 
Clearly, however, the EPA can maintain that the NAAQS will 
have health effects because the Clean Air Act empowers the 
agency to ensure that such benefits accrue; and it can 
maintain that the NAAQS will not directly affect small enti-
ties because it has no authority (short of imposing its own 
implementation plan upon a non-complying state) to impose 
any burdens upon such entities.

 Third, the Small Business Petitioners attempt to distin-
guish the possible effects upon small entities in this case from 
the indirect effects that, as we found in Mid-Tex, are not 
within the contemplation of the RFA. But Mid-Tex is not so 
easily distinguished. The petitioners in that case argued that 
the RFA required the FERC to consider economic effects not 
only upon regulated industries but also upon the small enti-
ties that are their wholesale customers, even though the 
customers were not directly regulated by the FERC. We 
rejected that argument, finding a "clear indication" in the 
language of s 603 that the RFA is "limited to small entities 
subject to the proposed regulation." Mid-Tex, 773 F.2d at 
342; see also Motor & Equip. Mfrs. Ass'n, 142 F.3d at 467 
n.18 ("The RFA itself distinguishes between small entities 
subject to an agency rule, to which its requirements apply, 
and those not subject to the rule, to which the requirements 
do not apply."); United Distribution Cos. v. FERC, 88 F.3d 
1105, 1170 (1996) (regulatory flexibility analysis provision 
applies only to "small entities that are subject to the require-
ments of the rule") (emphasis in original). That the Clean 
Air Act requires the States to submit SIPs that will achieve 
compliance with the NAAQS does not, in view of the States' 
nearly complete discretion to determine which entities will 
bear the burdens of a revised NAAQS, make such small 
entities as the SIPs may regulate any more subject to the 


EPA's regulation than were the wholesalers in Mid-Tex 
subject to regulation by the FERC.

 Finally, the Small Business Petitioners suggest that the 
Congress in enacting the SBREFA overruled our prior inter-
pretation of the RFA in Mid-Tex and its progeny. The 
SBREFA made a number of changes in the RFA, but it did 
not change anything in s 603 upon which we relied in Mid-
Tex. And although the Congress made a slight modification 
in s 605(b), we do not understand it to alter our analysis in 
Mid-Tex. Prior to 1996, s 605(b) required an agency to 
provide "a succinct statement explaining the reasons" for its 
certification that the promulgated rule would not have a 
significant economic impact upon small entities. That section 
now requires "a statement providing the factual basis for such 
certification." Our decision in Mid-Tex contemplates that an 
agency may justify its certification under the RFA upon the 
"factual basis" that the rule does not directly regulate any 
small entities. Nothing in the change to s 605(b) suggests 
that basis for certification is no longer permissible. (Indeed, 
the section of the statute amending s 605(b) is labeled "Tech-
nical and Conforming Amendments," see SBREFA s 243, 110 
Stat. at 866.) We therefore conclude that the EPA properly 
certified that its NAAQS would not have a significant impact 
upon a substantial number of small entities.

 III. Ozone

A.Subpart 2 and the Revised Ozone Standard

 In 1990 the Congress substantially revised the Clean Air 
Act by, among other things, adding specific enforcement 
provisions for carbon monoxide, particulate matter, sulfur 
oxides, nitrogen dioxide, lead, and as pertinent here, ozone. 
Previously, the Act required that all areas of the country not 
attaining the primary ozone standard, no matter how far from 
attainment, come into compliance "as expeditiously as practi-
cable but not later than December 31, 1987." 42 U.S.C. 
s 7502 (1988). Many areas had not attained the primary 
ozone NAAQS by that date; some were still a long way from 


doing so. The Congress responded to the continued ozone 
problem by enacting a new enforcement scheme, which it 
codified as Subpart 2 of Part D of the Clean Air Act, 42 
U.S.C. ss 7511-7511f, redesignating the original provisions as 
Subpart 1.

 Subpart 2 requires the EPA to classify nonattainment 
areas based upon their design value, which is a rough mea-
sure of whether an area complies with the 0.12 ppm, 1-hour 
primary ozone standard.6 A table in Subpart 2, set out here in 
the margin,7 establishes classifications ranging from marginal 
________

 6More specifically, the design value is the fourth-highest daily 
maximum ozone concentration in an area over three consecutive 
years for which there are sufficient data. If that value is less than 
or equal to 0.12 ppm, then an area will have only three expected 
values above that level and it will be in attainment with the ozone 
NAAQS. See EPA, The Clean Air Act Ozone Design Value Study: 
Final Report 1-1 to 1-22 (1994) (filed pursuant to 42 U.S.C. 
s 7511b(g), which required the EPA to conduct "a study of whether 
the [existing design value] methodology ... provides a reasonable 
indicator of the ozone air quality of ozone nonattainment areas"; 
the EPA concluded it did). 

 7This table appears in Clean Air Act s 181(a)(1), 42 U.S.C. 
s 7511(a)(1):

 TABLE 1
 Area Class Design value [ppm] Primary standard 
 attainment date
 Marginal 0.121 up to 0.138 3 years after
 November 15, 1990
Moderate 0.138 up to 0.160 6 years after
 November 15, 1990
Serious 0.160 up to 0.180 9 years after
 November 15, 1990
Severe 0.180 up to 0.280 15 years after
 November 15, 1990
Extreme 0.280 and above 20 years after
 November 15, 1990
 
 The Severe Area category is later subdivided, creating a sixth 
classification for ozone nonattainment areas. See id. s 7511(a)(2) 

to extreme, and provides an attainment date for each class. 
See id. s 7511(a)(1)-(2). Subpart 2 also specifies, for each 
class of nonattainment areas, both measures that the States 
must take to reduce emissions of the chemicals that are 
precursors of ozone and information that the States must 
report to the EPA. See id. s 7511a. In short, Subpart 2 is 
the Congress's comprehensive plan for reducing ozone levels 
throughout the country.

 The State and Non-State Petitioners, along with Congress-
man Bliley appearing as an amicus curiae, argue that Subpart 
2 precludes the EPA from revising the primary and second-
ary ozone NAAQS. We reject this argument (in Part III.A.1) 
insofar as it pertains to the EPA's continued ability to 
promulgate a revised ozone NAAQS or to designate areas as 
not in attainment with a revised NAAQS. We agree (in Part 
III.A.2) with those petitioners, however, insofar as they main-
tain, based upon the text and structure of Subparts 1 and 2, 
that the EPA is precluded from enforcing a revised primary 
ozone NAAQS other than in accordance with the classifica-
tions, attainment dates, and control measures set out in 
Subpart 2. Further, we conclude (in Part III.A.3) that the 
EPA may not require a State to comply with a revised 
secondary ozone NAAQS in any area that has yet to attain 
the 0.12 ppm primary standard.

 1. The EPA's Power to Revise the Ozone NAAQS and 
 Designate Areas as Nonattainment

 The 1990 amendments did not alter the section of the Clean 
Air Act that provides for setting and revising primary and 
secondary NAAQS. See 42 U.S.C. s 7409. The Administra-
tor, therefore, still must "at five-year intervals [from Decem-
ber 31, 1980] ... complete a thorough review of ... the 
[NAAQS] promulgated under this section and ... make such 
revisions in such ... standards ... as may be appropriate." 
Id. s 7409(d)(1). The Second Circuit held that this section 
continues to "set[ ] forth a bright-line rule for agency action," 

_____________________
("Notwithstanding table 1, [for] a severe area with a 1988 ozone 
design value between 0.190 and 0.280 ppm, the attainment date shall
 be 17 years ... after November 15, 1990"). 

American Lung Ass'n v. Reilly, 962 F.2d 258, 263 (1992), and 
we agree. Nothing in the Act modifies this "bright-line rule" 
or otherwise makes it inapplicable to revision of the ozone 
NAAQS.

 To the extent that the 1990 amendments shed any light 
upon this question, they suggest that the EPA retains its 
authority to revise the ozone NAAQS. For example, if the 
EPA relaxes a NAAQS after enactment of the 1990 amend-
ments, then "the Administrator shall ... promulgate require-
ments applicable to all areas which have not attained that 
[relaxed] standard as of the date of such relaxation.... 
[which] shall provide for controls ... not less stringent than 
the controls applicable to areas designated nonattainment 
before such relaxation." 42 U.S.C. s 7502(e). Although two 
other subsections of s 172 are expressly made inapplicable to 
the ozone regulations in Subpart 2, see id. s 7502(a)(1)(C), 
(a)(2)(D), this so-called anti-backsliding provision contains no 
such exemption. Accordingly, as the EPA notes, this section 
specifically contemplates that the agency may relax its ozone 
NAAQS and, therefore, necessarily implies that it retains the 
authority to revise that NAAQS. Tellingly, neither the peti-
tioners nor the amicus reply to this point.

 The petitioners and amicus raise two other arguments to 
support their position that the EPA cannot alter the ozone 
NAAQS without the approval of the Congress. We reject 
both in short order.

 First, the Non-State Petitioners contend that Subpart 2 
renders revision of the ozone NAAQS "inappropriate" within 
the meaning of s 109(d)(1), which provides the EPA shall 
"make such revisions in such ... standards ... as may be 
appropriate." 42 U.S.C. s 7409(d)(1). This argument, how-
ever, pointedly ignores the text immediately following the 
word "appropriate," which specifies that appropriateness is to 
be determined "in accordance with section 7408 ... and 
[s 7409(b)]" (and which, as we read it, means exclusively in 
accord with those sections). See, e.g., American Methyl 
Corp. v. EPA, 749 F.2d 826, 835-36 (D.C. Cir. 1984). Because 
Subpart 2 is neither listed in s 109(d)(1) nor incorporated by 


reference in either s 108, id. s 7408, or s 109(b), it cannot 
render revision of the ozone NAAQS inappropriate.

 Second, the State Petitioners and Congressman Bliley ar-
gue, based upon the classification table in s 181(a)(1), id. 
s 7511(a)(1), that Subpart 2 codified the 0.12 ppm ozone 
NAAQS and, therefore, only the Congress can promulgate a 
revised NAAQS. Yet not all areas designated nonattainment 
for ozone will have design values of 0.121 ppm or higher. In 
fact, this was true of areas designated nonattainment for 
ozone as a result of the 1990 amendments, see Ozone Final 
Rule, 62 Fed. Reg. at 38,884/3, at least in part because of the 
stringent criteria in the Clean Air Act for changing the 
designation of an area to attainment from nonattainment. 
See 42 U.S.C. 7407(d)(3)(E)(iii) (redesignation permissible 
only if area's attainment of NAAQS "is due to permanent and 
enforceable reductions in emissions"). In short, although the 
numbers in the classification table are based upon the 0.12 
ppm ozone NAAQS, they are neither equivalent to nor a 
codification of the NAAQS.

 Not only does the EPA, as we conclude above, retain 
authority to promulgate a revised ozone NAAQS; the agency 
is still required, "in no case later than 2 years from the date 
of promulgation" of a revised NAAQS, to designate areas as 
attainment, nonattainment, or unclassifiable under that 
NAAQS. Id. s 7407(d)(1)(B). Although the 1990 amend-
ments extended by roughly 18 months the maximum time 
between promulgation of a revised NAAQS and designation of 
nonattainment areas under that NAAQS, see 42 U.S.C. 
s 7407(d)(1)-(2) (1988), they made no substantive change in 
the EPA's authority to designate areas as nonattainment 
under a revised NAAQS. Therefore, we hold that the EPA 
retains the power to designate areas as nonattainment under 
a revised ozone NAAQS.

 2. The EPA's Power to Enforce the Revised Ozone 
 Standard

 That the enactment of Subpart 2 does not alter the EPA's 
authority to revise the ozone NAAQS or to designate areas as 
nonattainment for ozone does not, however, compel the con-


clusion that Subpart 2 has no effect upon the EPA's authority 
to enforce a revised primary ozone NAAQS. (We consider 
the enforcement of secondary ozone NAAQS in Part III.A.3, 
below.) In fact, the text and structure of Subparts 1 and 2 
suggest precisely the opposite conclusion. After designating 
an area as nonattainment under a NAAQS, the EPA normally 
looks to Subpart 1 for authority to "classify the area for the 
purpose of applying an attainment date." 42 U.S.C. 
s 7502(a)(1)-(2). The cited provisions, however, do not apply 
"with respect to nonattainment areas for which classifications 
[and attainment dates] are specifically provided under other 
provisions of [Part D of Subchapter 1 of the Clean Air Act]." 
Id. s 7502(a)(1)(C), (a)(2)(D).

 The EPA argues that Subpart 2 specifically provides classi-
fications and attainment dates only for nonattainment desig-
nations under the 0.12 ppm ozone NAAQS. The State and 
Non-State Petitioners counter that Subpart 2 specifically 
provides classifications and dates for all areas designated 
nonattainment under any ozone NAAQS. We agree with the 
petitioners.

 The pertinent provision of Subpart 2 reads as follows:

 (a) Classification and attainment dates for 1989 
 nonattainment areas. -- (1) Each area designated non-
 attainment for ozone pursuant to section 7407(d) of this 
 title shall be classified at the time of such designation, 
 under table 1, by operation of law, as a Marginal Area, a 
 Moderate Area, a Serious Area, a Severe Area, or an 
 Extreme Area....

Id. s 7511(a)(1). As the petitioners note, s 107(d), 42 U.S.C. 
s 7407(d), specifies three different times at which an area can 
be designated "nonattainment for ozone": immediately follow-
ing enactment of the 1990 amendments, id. s 7407(d)(4); 
after the EPA revises the ozone NAAQS, id. s 7407(d)(1); 
and when an area that was in attainment, either when the 
Congress enacted the 1990 amendments or when the EPA 
promulgated a revised ozone NAAQS, later ceases to comply, 
id. s 7407(d)(3). The petitioners conclude from the general 
reference to s 107(d) that the classifications and attainment 


dates in Subpart 2 apply to areas designated under 
ss 107(d)(1), (3), and (4). The EPA gamely responds that the 
reference to s 107(d) includes only subsection (4), but we do 
not defer to the agency's interpretation because we find that 
the Congress has spoken on the "precise question at issue" 
and we "must give effect to the unambiguously expressed 
intent of Congress." Chevron U.S.A. Inc., 467 U.S. 837, 842-
43 & n.9 (1984). We canvass the two reasons that lead us to 
this conclusion before returning to the EPA's argument.

 First, the reference to s 107(d) in s 181(a)(1) appears to 
have been purposeful and not the drafting error that the 
EPA's interpretation implies. The Congress considered but 
did not adopt bills that clearly would have limited the reach of 
Subpart 2 to nonattainment designations made immediately 
following enactment of the 1990 amendments. The Senate 
bill contained a version of Subpart 2 that classified only those 
areas designated nonattainment for ozone under its equiva-
lent of s 107(d)(4). See S. 1630, 101st Cong. ss 101, 107, 
reprinted in III Legislative History of the Clean Air Act 
Amendments of 1990, at 4124-25, 4195 [hereinafter 1990 
Legislative History]. The version of Subpart 2 in the House 
bill, as originally introduced, similarly referred only to desig-
nations made under its equivalent of s 107(d)(4). See H.R. 
3030, 101st Cong. ss 101(a), 103, reprinted in II 1990 Legisla-
tive History, at 3748-49, 3795-96. The House committee, 
however, replaced the specific reference to what is now 
s 107(d)(4) with a general reference to s 107(d). See H.R. 
Rep. No. 101-490, at 3-6, 17 (1990), reprinted in II 1990 
Legislative History, at 3027-30, 3041. The Conference com-
mittee then reported the text of the House bill rather than 
that of the Senate. See H.R. Rep. No. 101-952, at 335 (1990), 
reprinted in I 1990 Legislative History, at 1785.

 Second, our conclusion that the Congress intentionally re-
ferred to s 107(d) as a whole is supported by a comparison of 
Subparts 1 and 2. The Congress enacted Subpart 2 because 
of the failure of the controls in Subpart 1 to bring areas into 
attainment with the 0.12 ppm standard in the allotted time. 
See H.R. Rep. No. 101-490, at 145-50, reprinted in II 1990 
Legislative History, at 3169-74. Rather than continue treat-


ing all ozone nonattainment areas alike, the Congress allowed 
the various areas between 3 and 20 years to attain the ozone 
NAAQS, depending upon the extent of the area's ozone 
problem. See id. at 146-47 ("In 1977, Congress tried to 
waive [sic] a 'magic wand' and command that all nonattain-
ment areas [for ozone] will meet the applicable [NAAQS].... 
by December 31, 1987. ... [That] date[ ] ha[s] come and 
gone and it is clear that ... we had no 'magic' solutions."), 
reprinted in II 1990 Legislative History, at 3170-71. As the 
petitioners argue, because the 1990 amendments extended the 
time for nonattainment areas to comply with the 0.12 ppm 
ozone NAAQS, they must preclude the EPA from requiring 
areas to comply either more quickly or with a more stringent 
ozone NAAQS.

 Subpart 1 requires compliance with a primary NAAQS "as 
expeditiously as practicable, but no later than 5 years from 
the date such area was designated nonattainment." 42 
U.S.C. s 7502(a)(2)(A). All nonattainment areas would have 
until 2012 to comply with the revised ozone NAAQS if the 
EPA and the States were to take the full time authorized in 
Subpart 1 for making attainment designations and the EPA 
were to approve every possible extension for each area. See 
id. ss 7407(d)(1)(A)-(B), 7502(a)(2)(A), (C). Such wide discre-
tion is inconsistent, however, with Subpart 2, in which the 
Congress stripped the EPA of discretion to decide which 
ozone nonattainment areas should receive more time to reach 
attainment (with two limited exceptions not relevant here, see 
id. s 7511(a)(4), (5)). Moreover, under s 181(a) of Subpart 2, 
Los Angeles, the nation's only Extreme Area, has until 2010 
to attain the 0.12 ppm ozone NAAQS, and the possibility of 
extending that deadline until 2012. That Los Angeles should 
also have to attain a more stringent ozone standard by that 
same year, if not earlier, clearly runs counter to the compre-
hensive enforcement scheme enacted in Subpart 2.

 The EPA offers two arguments against this interpretation 
of Subparts 1 and 2. First, the EPA contends that a recent 
statute confirms its power to designate nonattainment areas 
under the revised ozone standard. See Pub. L. No. 105-178, 
s 6103(a), 112 Stat. 465 (1998) (extending time to two years 


from one year for governor to submit proposed designation 
under 0.08 ppm ozone NAAQS). That statute also specifically 
states, however, that "[n]othing in section[ ] ... 6103 shall be 
construed by the Administrator of Environmental Protection 
Agency or any court ... to affect any pending litigation or to 
be a ratification of the ozone ... standard[ ]." Id. s 6104. 
Further, even if the EPA were correct that s 6103 confirms 
the agency's power to designate areas under a revised ozone 
NAAQS, that power was never in doubt, as we concluded 
above. Indeed, s 6104 simply does not bear upon the ques-
tion we address here: whether Subpart 1 or Subpart 2 
provides the applicable enforcement mechanisms for an area 
designated nonattainment under a revised ozone NAAQS.

 Second, the EPA argues that read in context the reference 
to s 107(d) in s 181(a)(1) relates only to designations made 
under s 107(d)(4). Because the table in s 181(a)(1) classifies 
areas based upon a design value that roughly measures 
attainment of the 0.12 ppm ozone NAAQS, the EPA contends 
that the nonattainment designations referenced in s 181(a)(1) 
are only those designations made under the 0.12 ppm ozone 
NAAQS. This explanation, however, does not square with 
either the Congress's decision not to refer to s 107(d)(4) 
specifically or the long-term nature of the attainment scheme 
enacted in Subpart 2; on the EPA's interpretation, that 
scheme would have been stillborn had the EPA revised the 
ozone NAAQS immediately after the Congress enacted the 
1990 amendments.

 The EPA points next to s 181(b)(1), which specifies the 
attainment dates for areas that met the 0.12 ppm standard 
when the Congress enacted the 1990 amendments but that 
later cease to comply. That section, however, applies only to 
areas designated under s 107(d)(3) that previously were "des-
ignated attainment or unclassifiable for ozone under section 
[107(d)(4)]." That s 181(b)(1) provides special rules for such 
areas, but not for areas designated under s 107(d)(3) that had 
previously been designated attainment for ozone or unclassifi-
able under s 107(d)(1), does not support the EPA's argument 
that the phrase in s 181(a)(1) "designated nonattainment for 
ozone pursuant to section 107(d)" denotes only those designa-


tions made under s 107(d)(4). If anything, the specification 
of s 107(d)(4) in s 181(b)(1) makes its absence from 
s 181(a)(1) all the more striking.

 The final bit of context to which the EPA points is the title 
of s 181(a): "Classification and attainment dates for 1989 
nonattainment areas." Because the title specifies "1989 non-
attainment areas," we are told, s 181(a) must refer only to 
nonattainment designations made immediately after enact-
ment of the 1990 amendments, that is, designations made 
under s 107(d)(4). Although "the title of a statute or section 
can aid in resolving an ambiguity in the legislation's text," 
INS v. National Ctr. for Immigrants' Rights, Inc., 502 U.S. 
183, 189 (1991), a title cannot be allowed to create an ambigui-
ty in the first place. See Maguire v. Commissioner of 
Internal Revenue, 313 U.S. 1, 9 (1941) ("[T]he title of an act 
will not limit the plain meaning of the text."). The text of 
s 181(a) clearly encompasses nonattainment designations 
made under all subsections of s 107(d). There simply is no 
ambiguity in need of resolution by reference to the title of the 
section.

 In sum, s 181(a) "specifically provide[s]" for classifications 
and attainment dates for areas designated nonattainment for 
ozone pursuant to s 107(d)(1). Accordingly, Subpart 2, not 
Subpart 1, provides the classifications and attainment dates 
for any areas designated nonattainment under a revised 
primary ozone NAAQS, see 42 U.S.C. s 7502(a)(1)(C), 
(a)(2)(D), and the EPA must enforce any revised primary 
ozone NAAQS under Subpart 2.

 3. The Secondary Ozone NAAQS

 The Non-State Petitioners briefly contend that our conclu-
sion that Subpart 2 provides the classifications and attain-
ment dates for areas designated nonattainment under a re-
vised primary ozone NAAQS is equally applicable to the 
enforcement of a revised secondary ozone NAAQS. We find 
it impossible to conclude, however, that Subpart 2 "specifical-
ly provide[s]" for classifications and attainment dates for 
areas designated nonattainment with a revised secondary 
ozone NAAQS; s 181(a)(1) expressly refers only to primary 


NAAQS and Subpart 2 not once mentions secondary NAAQS. 
Further, attainment dates in Subpart 1 for secondary stan-
dards are less stringent than for primary standards, making 
comparison with the more lenient dates in Subpart 2 less 
troubling. Compare id. s 7502(a)(2)(B) (attainment of sec-
ondary NAAQS "shall be ... achieved as expeditiously as 
practicable after the date such area was designated nonattain-
ment"), with id. s 7502(a)(2)(A) (attainment of primary 
NAAQS "shall be ... achieved as expeditiously as practica-
ble, but no later than 5 years from the date such area was 
designated nonattainment"). Nonetheless, we understand 
Subpart 2 to codify the Congress's judgment as to what is "as 
expeditiously as practicable" in reducing an area's level of 
ozone. Consequently, the EPA is precluded from requiring 
any steps toward compliance with a revised secondary ozone 
NAAQS prior to an area's attainment of the 0.12 ppm stan-
dard. In areas that meet the 0.12 ppm standard, however, 
Subpart 2 erects no bar to the EPA's requiring compliance 
with a revised secondary ozone NAAQS "as expeditiously as 
practicable."

B.Ozone's Health Benefits

 Petitioners presented evidence that according to them 
shows the health benefits of tropospheric ozone as a shield 
from the harmful effects of the sun's ultraviolet rays--includ-
ing cataracts and both melanoma and nonmelanoma skin 
cancers. In estimating the effects of ozone concentrations, 
EPA explicitly disregarded these alleged benefits.

 EPA explained its decision first as a matter of statutory 
interpretation. Under the Clean Air Act, EPA's ambient 
standards for any pollutant are to be "based on [the] criteria" 
that EPA has published for that pollutant. 42 U.S.C. 
s 7409(b)(1) & (2). The "criteria," in turn, are to "reflect the 
latest scientific knowledge useful in indicating the kind and 
extent of all identifiable effects on public health or welfare 
which may be expected from the presence of such pollutant in 
the ambient air, in varying quantities." Id. s 7408(a)(2). 
The reference to "all identifiable effects" would seem on its 
face to include beneficent effects.


 EPA attempts to avoid this straightforward reading in 
several ways. First, it points to the term "such pollutant," 
arguing that the statute requires it to focus exclusively on the 
characteristics that make the substance a "pollutant." But 
the phrase "pollutant" is simply a label used to identify a 
substance to be listed and controlled by the statute. While it 
is perfectly true that a substance known to be utterly without 
adverse effects could not make it onto the list, this fact of 
nomenclature does not visibly manifest a congressional intent 
to banish consideration of whole classes of "identifiable ef-
fects."

 EPA also relies on the fact that two of the three specified 
considerations under s 108(a)(2)'s general mandate refer to 
"adverse effect[s]":

 The criteria for an air pollutant, to the extent practicable, 
 shall include information on--

 (A) those variable factors (including atmospheric 
 conditions) which of themselves or in combination with 
 other factors may alter the effects on public health or 
 welfare of such air pollutant;

 (B) the types of air pollutants which, when present 
 in the atmosphere, may interact with such pollutant to 
 produce an adverse effect on public health or welfare; 
 and

 (C) any known or anticipated adverse effects on 
 welfare.

Id. s 7408(a)(2) (emphasis added). EPA's argument would 
be of uncertain force even if all three types of effects specifi-
cally required to be considered were spoken of as "adverse 
effects"; there is no reason to read "adverse" back into the 
"all identifiable effects" of s 108(a)(2). But as one of the 
three specified classes refers to "effects" unmodified, id. 
s 7408(a)(2)(A), we can reject EPA's argument without even 
reaching that issue. That Congress qualified "effects" in 
clauses (B) and (C) with "adverse" seems only to strengthen 
the supposition that in (A)--and in the general mandate--it 
intended to cover all health or welfare effects. Therefore if 
petitioners' contentions are right, clause (A) applies to ozone: 

the presence of ultraviolet radiation at various levels "alter[s] 
the effects [of ozone] on public health or welfare" by making 
them on the whole less malign--perhaps even beneficial.

 EPA next argues that Title VI of the Clean Air Act, id. 
ss 7671-7671q, which mandates certain measures to preserve 
stratospheric ozone, represents a complete consideration of 
ozone's beneficial role as a UV shield. Petitioners' claim, 
however, is that ground-level (tropospheric) ozone--the sub-
ject of this rule--has a UV-screening function independent of 
the ozone higher in the atmosphere. EPA points to nothing 
in the statute that purports to address tropospheric ozone.

 Finally, EPA directs us towards legislative history from the 
1970 and 1990 Clean Air Act Amendments. The "all identifi-
able effects" language, however, dates to the 1967 Amend-
ments. Legislative history from the 1970 and 1990 Congress-
es cannot be "an authoritative interpretation of what the 
[1967] statute meant," because it is "the function of the courts 
and not the Legislature, much less a Committee of one House 
of the Legislature, to say what an enacted statute means." 
Pierce v. Underwood, 487 U.S. 552, 566 (1988).

 Under Chevron, we defer to an agency's interpretation of a 
statute if "the statute is silent or ambiguous with respect to 
the specific issue" and "the agency's answer is based on a 
permissible construction of the statute." 467 U.S. at 843. 
We find no such ambiguity in this case. Further, EPA's 
interpretation fails even the reasonableness standard of Chev-
ron's second part: it seems bizarre that a statute intended to 
improve human health would, as EPA claimed at argument, 
lock the agency into looking at only one half of a substance's 
health effects in determining the maximum level for that 
substance. At oral argument even EPA counsel seemed 
reluctant to claim that the statute justified disregard of the 
beneficent effects of a pollutant bearing directly on the health 
symptoms that accounted for its being thought a pollutant at 
all (suppose, for example, a chemical that both impedes and 
enhances breathing, depending on the person or circum-
stances); he also seemed unable to distinguish that case from 


the one here--where the chemical evidently impedes breath-
ing but provides defense against various cancers.

 Legally, then, EPA must consider positive identifiable ef-
fects of a pollutant's presence in the ambient air in formulat-
ing air quality criteria under s 108 and NAAQS under s 109. 
EPA's other arguments are technical, and are of two sorts: 
those that allegedly show petitioners' studies to be fatally 
flawed and those that allegedly show specific inflation of 
results in these studies. We need only consider the first sort, 
for EPA chose to give the studies no weight at all.

 Petitioners rely primarily on studies by Lutter and Cupitt. 
EPA found that these could be ignored because the marginal 
benefits are difficult, if not impossible, to quantify reliably 
and because there is "no convincing basis for concluding that 
any such effects ... would be significant." But these are not 
the criteria by which EPA assesses adverse health effects. It 
does not rigorously or uniformly demand either quantifiabili-
ty, see, e.g., Ozone Final Rule, 62 Fed. Reg. at 38,860/3 
(admitting that "quantitative risk estimates could not be 
developed" for certain adverse effects of ozone on which EPA 
regulated); EPA Ozone Brief at 48 (defending consideration 
of various effects that "played an important role in the 
Administrator's final decision" despite absence of quantifica-
tion: "EPA did not estimate the risk for such effects because 
'information [was] too limited to develop quantitative esti-
mates,'--not because there is doubt the effects occur.") (alter-
ation and emphasis in original) (citation omitted), or any 
specific level of significance. As we can see no reason for 
imposing a higher information threshold for beneficent effects 
than for maleficent ones, we have no basis for affirming 
EPA's decision to disregard the studies.

 As we said above, we are remanding to EPA to formulate 
adequate decision criteria for its ordinary object of analysis--
ill effects. We leave it to the agency on remand to determine 
whether, using the same approach as it does for those, 
tropospheric ozone has a beneficent effect, and if so, then to 
assess ozone's net adverse health effect by whatever criteria 
it adopts.


 IV. Particulate Matter

A.PM10 as Coarse Particle Indicator

 We now turn to petitioners' challenges to the Agency's 
regulation of coarse particulate pollution. Both the 1987 
NAAQS and the proposed standards regulate all particles 
with diameters under 10 micrometers, signified by the indica-
tor PM10. The PM10 spectrum includes both coarse and fine 
particles. While the main distinction between coarse and fine 
particles is the process by which they are produced, EPA and 
epidemiologists who study the health effects of particulate 
pollution identify coarse and fine particles through rough 
approximations of those particles' diameters. Coarse parti-
cles, which become airborne usually from the crushing and 
grinding of solids, generally have diameters between 2.5 and 
10 micrometers and can thus be identified by the indicator 
PM10-2.5. Fine particles, indicated in these new NAAQS by 
PM2.5, come mainly from combustion or gases and generally 
have diameters of 2.5 micrometers or less.

 Despite EPA's conclusion that coarse and fine particles 
pose independent and distinct threats to public health, the 
Agency chose not to adopt an indicator, such as PM10-2.5, that 
would measure only the coarse fraction of PM10. Petitioners 
make two arguments: that there is no scientific basis for 
regulating coarse particles at all, and that even if there were, 
retention of the PM10 indicator simultaneously with the estab-
lishment of the new fine particle indicator is unsupported by 
evidence in the record and arbitrary and capricious. We 
agree with this latter argument.

 Beginning with petitioners' first challenge, we think the 
record contains sufficient evidence to justify the Agency's 
decision to regulate coarse particulate pollution. While the 
relationship between PM10 pollution and adverse health ef-
fects justifying the 1987 NAAQS was well-established, see 
NRDC v. EPA, 902 F.2d 962, 967-68 (D.C. Cir. 1990), two 
studies contained in the record of these proceedings concen-
trated specifically on the health effects caused by the coarse 
fraction of PM10 pollution. See Mary Ellen Gordian et al., 
"Particulate Air Pollution and Respiratory Disease in Anchor-

age, Alaska," 104 Envtl. Health Persp. 290 (1996) (studying 
volcanic ash); Brockton J. Hefflin et al., "Surveillance for 
Dust Storms and Respiratory Diseases in Washington State, 
1991," 49 Archives of Envtl. Health 170 (1994) (studying 
fugitive dust). In addition, the record contains at least nine 
multivariate analyses finding statistically significant relation-
ships with health effects for both PM2.5 and PM10, suggesting 
that the portion of PM10 pollution unaccounted for by PM2.5 
(i.e., coarse particles) explains some of the observed adverse 
health effects. In other words, because regression analysis 
holds the PM2.5 component constant, the PM10 effect recog-
nized in these equations actually evidences results from 
coarse particulate pollution. To be sure, petitioners have 
pointed to some evidence to the contrary. But given that our 
review is limited to "ascertaining that the choices made by 
the Administrator were reasonable and supported by the 
record," and does not include "judg[ing] the merits of compet-
ing expert views," Lead Industries, 647 F.2d at 1160, we find 
ample support for EPA's decision to regulate coarse particu-
late pollution above the 1987 levels.

 Having found independent health consequences from 
coarse particulate pollution, EPA nevertheless decided to 
regulate the coarse fraction of PM10 indirectly, using PM10 
(which includes both coarse and fine PM) as a "surrogate for 
coarse fraction particles." PM Final Rule, 62 Fed. Reg. at 
38,668/2. While recognizing that PM10-2.5 would have served 
as a satisfactory coarse particle indicator, EPA offers three 
justifications for its decision to use PM10 instead: (1) Both the 
Gordian and Hefflin studies used PM10, not PM10-2.5, as the 
variable in their models, (2) the PM10 standards will work in 
conjunction with the PM2.5 standards by regulating the por-
tion of particulate pollution not regulated by the PM2.5 stan-
dards, and (3) a nationwide monitoring program for PM10 
already exists. We find none of these explanations persua-
sive.

 As to the first argument, while acknowledging that the 
indicator used in the studies captures both coarse and fine 
particles, EPA nevertheless maintains that PM10 is an effec-
tive indicator for the regulation of coarse particulate pollu-


tion. "Adopting the indicator used in the studies," the Agen-
cy says, "increases the likelihood that the level selected will 
result in the health protections predicted." But as EPA's 
own staff paper suggests, PM10 is "inherently confounded" by 
the presence of PM2.5 particles, meaning that any regulation 
of PM10 pollution will include both coarse and fine particles. 
See PM Staff Paper at V-59. Using PM10 as the coarse 
particle indicator, instead of PM10-2.5, will thus regulate more 
than just the coarse fraction of PM10, and the amount of 
coarse particulate pollution permitted will depend (quite arbi-
trarily) on the amount of PM2.5 pollution in the air. For 
example, assuming the 50 microgram annual PM10 level 
adopted by the Agency and a region with an annual PM2.5 
pollution level of 15 micrograms, the PM10 indicator would 
prohibit coarse particulate (PM10-2.5) pollution from exceeding 
35 micrograms. But in an area with only 5 micrograms of 
PM2.5 pollution, the NAAQS would permit coarse particulate 
pollution to reach as high as 45 micrograms.

 EPA's second argument--that the PM10 standard will work 
in conjunction with the PM2.5 standard--suffers from the 
same deficiency. Accepting EPA's finding of "profound phy-
sicochemical differences" between coarse and fine PM, PM 
Staff Paper at V-59, such that each requires independent 
regulation, we cannot discern exactly how a PM10 standard, 
instead of a PM10-2.5 standard, will work alongside a PM2.5 
standard to regulate only the coarse fraction of PM10. EPA 
provides no explanation to aid us in understanding its deci-
sion. In fact, as the example above indicates, it is the very 
presence of a separate PM2.5 standard that makes retention of 
the PM10 indicator arbitrary and capricious. Far from work-
ing in conjunction to regulate coarse particles, PM10 and PM2.5 
indicators, when used together, lead to "double regulation" of 
the PM2.5 component of PM10 and potential underregulation of 
the PM10-2.5 component since the amount of PM10-2.5 permitted 
will always depend on the amount of PM2.5 in the air.

 EPA's final argument is pragmatic. It maintains that PM10 
is a better indicator than PM10-2.5 for coarse particulate 
pollution because a nationwide monitoring program for PM10 


already exists. But as EPA acknowledges elsewhere in its 
brief, NRDC bars EPA from considering factors unrelated to 
public health in setting air quality standards. Echoing our 
decision in Vinyl Chloride, NRDC held that "the Administra-
tor may not consider cost and technological feasibility in 
determining what is 'safe'; such a determination 'must be 
based solely upon the risk to health.' " NRDC, 902 F.2d at 
973 (quoting Vinyl Chloride, 824 F.2d 1146, 1166 (D.C. Cir. 
1990) (in banc)); see also American Petroleum Inst. v. Costle, 
665 F.2d 1176, 1185 (D.C. Cir. 1981); Lead Industries, 647 
F.2d at 1148-55. The administrative convenience of using 
PM10 cannot justify choosing an indicator poorly matched to 
the relevant pollution agent.

 In view of our conclusion that PM10 amounts to an arbitrary 
indicator for coarse particle pollution, we need not address 
petitioners' separate challenge to the PM10 levels or second-
ary standards. We note, however, that whatever levels the 
Agency ultimately selects for coarse particle pollution will 
need to comply with the requirements set forth in Part I of 
this opinion.

B.Fine Particles as "New Pollutant"

 The Attorneys General of Ohio, Michigan, and West Virgi-
nia ("state petitioners") argue that EPA is regulating PM2.5 
for the first time. Because they consider PM2.5 to be a "new 
pollutant," they argue that s 108 of the Clean Air Act re-
quires EPA to conduct further research on PM2.5's health 
effects before listing it as a pollutant, to issue an air quality 
criteria document reflecting the latest science on the health 
effects of the pollutant, and to assist states by developing 
"data relating to the cost of installation and operation, energy 
requirements, emission reduction benefits, and environmental 
impact of the emission control technology." 42 U.S.C. 
s 7408(b)(1).

 Although EPA never responds to this argument, five north-
eastern states (as respondent intervenors and amici) do. 
Pointing out that previous NAAQS have always included 
PM2.5, these attorneys general support the EPA's decision not 
to list PM2.5 separately as a new pollutant. We agree.

 The state petitioners cannot escape the fact that the origi-
nal standards for particulate pollution using Total Suspended 
Particulates (TSP) as indicator, as well as the 1987 NAAQS 
that used PM10, included by definition every particle 2.5 
micrometers and smaller. Moreover, in some areas fine 
particles often dominate PM10 pollution. See PM Staff Paper 
at V-63. By refining the NAAQS to focus on smaller parti-
cles that EPA found posed distinct threats to public health, 
EPA has done with these regulations exactly what we held it 
could do in 1987 when it made the change from Total Sus-
pended Particulates to PM10. See NRDC, 902 F.2d at 965-66. 
EPA's decision to update the NAAQS to focus on PM2.5 
merely continues a trend based on evolving science. It does 
not violate the provisions of s 108 of the Clean Air Act.

C.Failure to Identify a Biological Mechanism for Particu-
 late Pollution's Relationship to Adverse Health Effects

 Also challenging the establishment of a fine particle stan-
dard, non-state petitioners argue that EPA failed to explain 
the biological mechanism through which particulate pollution 
causes adverse health effects. Even if epidemiological stud-
ies show robust statistical relationships between pollution and 
health effects, they say, the absence of proof of causation--
i.e., how particles actually interact with cells and organs to 
cause sickness and death--is fatal to the standard. We 
disagree.

 To begin with, the statute itself requires no such proof. 
The Administrator may regulate air pollutants "emissions of 
which, in his judgment, cause or contribute to air pollution 
which may reasonably be anticipated to endanger public 
health or welfare." 42 U.S.C. s 7408(a)(1)(A) (1994) (empha-
sis added). Moreover, this court has never required the type 
of explanation petitioners seek from EPA. In fact, we have 
expressly held that EPA's decision to adopt and set air 
quality standards need only be based on "reasonable extrapo-
lations from some reliable evidence." NRDC v. Thomas, 805 
F.2d 410, 432 (D.C. Cir. 1986). Indeed, were we to accept 
petitioners' view, EPA (or any agency for that matter) would 
be powerless to act whenever it first recognizes clear trends 


of mortality or morbidity in areas dominated by a particular 
pathogen.

 The numerous epidemiological studies appearing in this 
record, some of which EPA also used to support the 1987 
NAAQS, easily satisfy the standard articulated in the statute 
and emphasized repeatedly in decisions of this court. Cover-
ing diverse geographic locations with widely varying mixes of 
air pollution, the studies found statistically significant rela-
tionships between air-borne particulates signified by a variety 
of indicators and adverse health effects. Given EPA's statu-
tory mandate to establish standards based on "the latest 
scientific knowledge," 42 U.S.C. ss 7408(a)(2), 7409(d), the 
growing empirical evidence demonstrating a relationship be-
tween fine particle pollution and adverse health effects amply 
justifies establishment of new fine particle standards.

D.Visibility Effects

 The Environmental Petitioners challenge the EPA's deci-
sion to set the secondary PM2.5 NAAQS at levels equivalent to 
the primary NAAQS. According to the petitioners, the 
EPA's failure to set the secondary NAAQS at more stringent 
levels will result in "adverse visibility impacts" in parts of the 
country. In view of our conclusion in Part I, above, that the 
EPA has not adequately explained the principles upon which 
it relied in setting the levels in the NAAQS for PM, we need 
not reach the main thrust of the petitioners' challenge to the 
secondary NAAQS. On the other hand, the Environmental 
Petitioners have also raised a question of statutory interpre-
tation, the resolution of which should assist the EPA if it 
revisits its decision to set the secondary PM2.5 NAAQS.

 In the PM Final Rule, the EPA decided "to address the 
welfare effects of PM on visibility by setting secondary 
standards identical to the suite of PM2.5 primary standards, in 
conjunction with the establishment of a regional haze pro-
gram under s 169A of the Act." PM Final Rule, 62 Fed. 
Reg. at 38,679/3. Section 169A "declares as a national goal 
the prevention ... and the remedying of any ... impairment 
of visibility in mandatory class I Federal areas ... result[ing] 
from manmade air pollution." 42 U.S.C. s 7491. Mandatory 


class I areas include all international parks, and national 
parks and wilderness areas of a certain size. See 42 U.S.C. 
s 7472(a). The EPA concluded that reduction of PM2.5 levels 
in class I areas would benefit the surrounding areas as well 
because "the same haze that degrades visibility within or 
looking out from a national park also degrades visibility 
outside it." PM Final Rule, 62 Fed. Reg. at 38,682/1.

 The Environmental Petitioners argue that s 109(b)(2), 42 
U.S.C. s 7409(b)(2), requires the EPA to set secondary 
NAAQS at a level sufficient to eliminate all adverse visibility 
effects and that it leaves the EPA no discretion to decide that 
some visibility impairment is better remedied through anoth-
er program. This argument must be wrong. For, as the 
EPA argues, the Congress required the EPA to implement a 
regional haze program specifically in order to address ad-
verse visibility effects that persist in class I areas after 
attainment of the secondary NAAQS. See 42 U.S.C. 
s 7470(1) (purpose of this part of Clean Air Act is "to protect 
public ... welfare from any actual or potential adverse effect 
which ... may reasonably be anticipate[d] to occur ... 
notwithstanding attainment and maintenance of all 
[NAAQS]"). Accordingly, we conclude that the Congress did 
not intend the secondary NAAQS to eliminate all adverse 
visibility effects and, therefore, that the EPA acted within the 
scope of its authority in deciding to rely upon the regional 
haze program to mitigate some of the adverse visibility 
effects caused by PM2.5.

 Conclusion

 We remand the cases to EPA for further consideration of 
all standards at issue. We do not vacate the new ozone 
standards because the standard is unlikely to engender costly 
compliance activities in light of our determination that it 
cannot be enforced by virtue of Clean Air Act s 181(a), 42 
U.S.C. s 7511(a). We vacate the challenged coarse particu-
late matter standards because EPA will have to develop 
different standards when it corrects the arbitrarily chosen 
PM10 indicator. As to the fine particulate matter standards, 


we invite briefing on the question of remedy: possibilities 
include but are not limited to vacatur, non-vacatur subject to 
application to vacate, and non-vacatur.8 An order giving the 
briefing particulars will follow.

 Because of the substantial investment of time this matter 
has required and the many unresolved issues bearing on 
application of whatever standards may emerge, this panel will 
in the interest of judicial economy retain jurisdiction over the 
cases following remand. See Sierra Club v. Gorsuch, 715 
F.2d 653, 661 (D.C. Cir. 1983).

________

 8Briefing should address the possibility that the previous 
particulate matter standard will spring back to life in response to 
our decision to vacate the new coarse particulate matter standard. 

 Tatel, Circuit Judge, dissenting from Part I:

 The Clean Air Act has been on the books for decades, has 
been amended by Congress numerous times, and has been 
the subject of regular congressional oversight hearings. The 
Act has been parsed by this circuit no fewer than ten times in 
published opinions delineating EPA authority in the NAAQS-
setting process. Yet this court now threatens to strike down 
section 109 of the Act as an unconstitutional delegation of 
congressional authority unless EPA can articulate an intelligi-
ble principle cabining its discretion. In doing so, the court 
ignores the last half-century of Supreme Court nondelegation 
jurisprudence, apparently viewing these permissive prece-
dents as mere exceptions to the rule laid down 64 years ago 
in A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 
495 (1935). Because section 109's delegation of authority is 
narrower and more principled than delegations the Supreme 
Court and this court have upheld since Schechter Poultry, 
and because the record in this case demonstrates that EPA's 
discretion was in fact cabined by section 109, I respectfully 
dissent.

 Section 109 requires EPA to publish air quality standards 
"the attainment and maintenance of which in the judgment of 
the Administrator, based on such criteria and allowing an 
adequate margin of safety, are requisite to protect the public 
health." 42 U.S.C. s 7409(b)(1) (1994). Compare section 109 
to the language of section 303 of the Communications Act of 
1934, which gave the FCC authority to regulate broadcast 
licensing in the "public interest," and which the Supreme 
Court sustained in National Broadcasting Co. v. United 
States, 319 U.S. 190, 225-26 (1943). The FCC's general 
authority to issue regulations "as public convenience, interest, 
or necessity requires" was sustained in United States v. 
Southwestern Cable Co., 392 U.S. 157, 178 (1968). The Su-
preme Court has sustained equally broad delegations to other 
agencies, including the Price Administrator's authority to fix 
"fair and equitable" commodities prices, Yakus v. United 
States, 321 U.S. 414, 426-27 (1944), the Federal Power Com-
mission's authority to determine "just and reasonable" rates, 

FPC v. Hope Natural Gas Co., 320 U.S. 591, 600 (1944), the 
War Department's authority to recover "excessive profits" 
earned on military contracts, Lichter v. United States, 334 
U.S. 742, 778-786 (1948), and the Attorney General's authori-
ty to regulate new drugs that pose an "imminent hazard to 
public safety," Touby v. United States, 500 U.S. 160, 165 
(1991). See also Milk Indus. Foundation v. Glickman, 132 
F.3d 1467, 1475 (D.C. Cir. 1998) (upholding delegation to 
Secretary of Agriculture to approve interstate compacts upon 
a finding of "compelling public interest").

 Given this extensive Supreme Court precedent sustaining 
general congressional delegations, no wonder the First Cir-
cuit rejected a similar nondelegation challenge to the Clean 
Air Act's "requisite to protect the public health" language:

 The power granted to EPA is not "unconfined and 
 vagrant". [Schechter Poultry, 295 U.S. at 551 (Cardozo, 
 J., concurring).] The Agency has been given a well 
 defined task by Congress--to reduce pollution to levels 
 "requisite to protect the public health", in the case of 
 primary standards. The Clean Air Act outlines the 
 approach to be followed by the Agency and describes in 
 detail many of its powers.... Yet there are many 
 benchmarks to guide the Agency and the courts in 
 determining whether or not EPA is exceeding its powers, 
 not the least of which is that the rationality of the means 
 can be tested against goals capable of fairly precise 
 definition in the language of science.

 Administrative agencies are created by Congress be-
 cause it is impossible for the Legislature to acquire 
 sufficient information to manage each detail in the long 
 process of extirpating the abuses identified by the legis-
 lation; the Agency must have flexibility to implement the 
 congressional mandate. Therefore, although the delega-
 tion to EPA was a broad one, ... we have little difficulty 
 concluding that the delegation was not excessive.

South Terminal Corp. v. EPA, 504 F.2d 646, 677 (1st Cir. 
1974).


 I do not agree with my colleagues that International 
Union, UAW v. OSHA, 938 F.2d 1310 (D.C. Cir. 1991) 
("Lockout/Tagout I"), requires a different result. That case 
remanded to OSHA for a more precise definition of section 
3(8) of the Occupational Safety and Health Act, which granted 
the Agency authority to enact workplace safety standards 
"reasonably necessary or appropriate to provide safe or 
healthful employment or places of employment." Id. at 1316. 
The Clean Air Act does not delegate to EPA authority to do 
whatever is "reasonably necessary or appropriate" to protect 
public health. Instead, the statute directs the Agency to 
fashion standards that are "requisite" to protect the public 
health. In other words, EPA must set pollution standards at 
levels necessary to protect the public health, whether "rea-
sonable" or not, whether "appropriate" or not.

 Moreover, in setting standards "requisite to protect the 
public health" EPA discretion is not unlimited. The Clean 
Air Act directs EPA to base standards on "air quality crite-
ria" that "accurately reflect the latest scientific knowledge 
useful in indicating the kind and extent of all identifiable 
effects on public health or welfare which may be expected 
from the presence of such pollutant in the ambient air, in 
varying quantities." 42 U.S.C. s 7408(a)(2); see id. 
s 7409(b)(1); see also id. s 7408(a)(2) (requiring air quality 
criteria, "to the extent practicable," to "include information 
on--(A) those variable factors (including atmospheric condi-
tions) which of themselves or in combination with other 
factors may alter the effects on public health or welfare of 
such air pollutant; (B) the types of air pollutants which, when 
present in the atmosphere, may interact with such pollutant 
to produce an adverse effect on public health or welfare; and 
(C) any known or anticipated adverse effects on welfare"). 
Indeed, the principles constraining EPA discretion are at 
least as specific as those this court sustained in Lockout/Tag-
out II, i.e., that OSHA must identify a " 'significant' safety 
risk, to enact a safety standard that provides 'a high degree 
of worker protection'." International Union, UAW v. 
OSHA, 37 F.3d 665, 669 (D.C. Cir. 1994) ("Lockout/Tagout 
II"). By directing EPA to set NAAQS at levels "requisite"--


not reasonably requisite--to protect the public health with 
"an adequate margin of safety," the Clean Air Act tells EPA 
exactly the same thing, i.e., ensure a high degree of protec-
tion.

 Although this court's opinion might lead one to think that 
section 109's language permitted EPA to exercise unfettered 
discretion in choosing NAAQS, the record shows that EPA 
actually adhered to a disciplined decisionmaking process con-
strained by the statute's directive to set standards "requisite 
to protect the public health" based on criteria reflecting the 
"latest scientific knowledge." To identify which health effects 
were "significant enough" to warrant protection, EPA fol-
lowed guidelines published by the American Thoracic Society. 
See National Ambient Air Quality Standards for Ozone: 
Proposed Decision, 61 Fed. Reg. 65,716, 65,722/1 (1996). It 
then set the ozone and fine particle standards within ranges 
recommended by CASAC, the independent scientific advisory 
committee created pursuant to section 109 of the Act. See 42 
U.S.C. s 7409(d)(2).

 CASAC must consist of at least one member of the Nation-
al Academy of Sciences, one physician, and one person repre-
senting state air pollution control agencies. See id. 
s 7409(d)(2)(A). In this case, CASAC also included medical 
doctors, epidemiologists, toxicologists and environmental sci-
entists from leading research universities and institutions 
throughout the country. EPA must explain any departures 
from CASAC's recommendations. See id. s 7607(d)(3). 
Bringing scientific methods to their evaluation of the Agen-
cy's Criteria Document and Staff Paper, CASAC provides an 
objective justification for the pollution standards the Agency 
selects. Cf. Daubert v. Merrell Dow Pharmaceuticals, Inc., 
509 U.S. 579, 593 (1993) (" 'Scientific methodology today is 
based on generating hypotheses and testing them to see if 
they can be falsified; indeed, this methodology today is what 
distinguishes science from other fields of human inquiry.' ") 
(citation omitted). Other federal agencies with rulemaking 
responsibilities in technical fields also rely heavily on the 
recommendations, policy advice, and critical review that scien-
tific advisory committees provide. See, e.g., 21 U.S.C. 


s 355(n) (describing scientific advisory panels for the Food 
and Drug Administration); 49 U.S.C. s 44912(c) (creating a 
scientific advisory panel for the Federal Aviation Administra-
tion).

 Beginning with CASAC's ozone recommendations--not one 
member recommended going below .08 ppm--EPA gave two 
perfectly rational explanations for the level it selected. First, 
it set the annual level based on the different types of health 
effects observed above and below .08 ppm. Particularly 
below .08, the Agency determined, "[t]he most certain 
[ozone-]related effects, while judged to be adverse, are tran-
sient and reversible." National Ambient Air Quality Stan-
dards for Ozone, 62 Fed. Reg. 38,856, 38,868/2 (1997) (empha-
sis added). Characterizing this explanation as saying nothing 
more than that "lower exposure levels are associated with 
lower risk to public health," Maj. Op. at 10, my colleagues 
find the Agency's reasoning unintelligible. But EPA did not 
find simply that public health risks decrease at lower levels. 
Instead, it found that public health effects differ below .08 
ppm, i.e., that they are "transient and reversible."

 Second, EPA explained that the level should not be set 
below naturally occurring background ozone concentrations. 
The Agency selected .08 ppm because it found that "a 0.07 
ppm level would be closer to peak background levels that 
infrequently occur in some areas due to nonanthropogenic 
sources of [ozone] precursors, and thus more likely to be 
inappropriately targeted in some areas on such sources." 62 
Fed. Reg. at 38,868/3. Of course, any level of ozone pollution 
above background concentrations is closer to background 
levels than one just above it. See Maj. Op. at 11. But as I 
read EPA's explanation, the Agency found that peak back-
ground levels sometimes occur at .07 ppm, not at .08 ppm. 
Indeed, the data EPA provided in its "Responses to Signifi-
cant Comments" show a range of background concentrations 
from a low of .042 ppm in Olympic National Park in Washing-
ton to a high of .075 ppm in Quachita National Forest in 
Arizona. No region registered background levels above .075 
ppm. See U.S. Environmental Protection Agency, Responses 
to Significant Comments on the 1996 Proposed Rule on the 


National Ambient Air Quality Standards for Ozone 94-96 
(July 1997). In other words, by setting the annual standard 
at .08 rather than .07 ppm, EPA ensured that if a region 
surpasses the ozone standard, it will do so because of control-
lable human activity, not because of uncontrollable natural 
levels of ozone.

 EPA offered an equally reasonable explanation for the fine 
particle pollution standard. Again limiting itself to the range 
approved by CASAC, EPA set the annual standard for PM2.5 
pollution at the lowest level where it had confidence that the 
epidemiological evidence (filtered through peer-reviewed, 
published studies) displayed a statistically significant relation-
ship between air pollution and adverse public health effects.

 Recognizing that its decision must "accurately reflect the 
latest scientific knowledge useful in indicating the kind and 
extent of all identifiable effects on public health," 42 U.S.C. 
s 7408(a)(2), EPA focused on three studies in the record that 
displayed a statistically significant relationship between fine 
particle pollution and adverse health effects: Joel Schwartz et 
al., Is Daily Mortality Associated Specifically with Fine 
Particles?, 46 J. Air & Waste Mgmt. Ass'n 927 (1996); Joel 
Schwartz et al., Acute Effects of Summer Air Pollution on 
Respiratory Symptom Reporting in Children, 150 Am. J. 
Respiratory & Critical Care Med. 1234 (1994); and Douglas 
W. Dockery et al., An Association between Air Pollution and 
Mortality in Six U.S. Cities, 329 New Eng. J. Med. 1753 
(1993). The Agency explained that "there is generally great-
est statistical confidence in observed associations [between 
fine particle pollution and adverse health effects] for levels at 
and above the mean concentration [of pollution observed in 
the studies that showed a statistically significant relation-
ship]." National Ambient Air Quality Standards for Partic-
ulate Matter, 62 Fed. Reg. 38,652, 38,676/1 n.42 (1997) (em-
phasis added). Allowing "an adequate margin of safety," 
EPA then set the annual fine particle standard just below the 
lowest mean pollution levels observed in those studies, at 15 
Sg/m3. See id. at 38,676/1 ("An examination of the long-term 
means from the combined six city analyses of daily mortality 
[Schwartz et al. (1996)] and morbidity [Schwartz et al. (1994)], 


together with those from studies in individual cities for which 
statistically significant PM-effects associations are reported 
... finds mean concentrations ranging from about 16 to about 
21 Sg/m3...."); id. at 38,676/2 ("[The EPA] Staff Paper 
assessment of the concentration-response results [from Dock-
ery et al. (1993)], concluded that the evidence for increased 
risk was more apparent at annual concentrations at or above 
15 Sg/m3....").

 In a passage directly answering this court's concerns, see 
Maj. Op. at 11-12, the Staff Paper explained why the long-
term mean served as a reasonable level for setting the fine 
particle NAAQS:

 The mean (or median) concentration may serve as a 
 reasonable cutpoint of increased PM health risk since at 
 this point there is generally the greatest confidence (i.e., 
 the smallest confidence intervals) in the association and 
 the reported [relative risk] estimates. The mean concen-
 tration considered by staff as most informative to test 
 implications of potential alternative concentration-
 response functions is the minimum mean concentration 
 associated with a study or studies reporting statistically 
 significant increases in risk across a number of study 
 locations....

Office of Air Quality Planning and Standards, U.S. Environ-
mental Protection Agency, Review of National Ambient Air 
Quality Standards for Particulate Matter: Policy Assess-
ment of Scientific and Technical Information, at E-4 (1996) 
(emphasis added).

 EPA thus did not, as my colleagues charge, arbitrarily pick 
points on the ozone and particulate pollution continua indis-
tinguishable from any other. Instead, acting pursuant to 
section 109's direction that it establish standards that, based 
on the "latest scientific knowledge" are "requisite" to protect 
the public health with "an adequate margin of safety," and 
operating within ranges approved by CASAC, the Agency set 
the ozone level just above peak background concentrations 
where the most certain health effects are not transient and 
reversible, and the fine particle level at the lowest long-term 


mean concentration observed in studies that showed a statisti-
cally significant relationship between fine particle pollution 
and adverse health effects. Whether EPA arbitrarily select-
ed the studies it relied upon or drew mistaken conclusions 
from those studies (as petitioners argue), or whether EPA 
failed to live up to the principles it established for itself (as 
my colleagues believe, see Maj. Op. at 9-12), has nothing to do 
with our inquiry under the nondelegation doctrine. Those 
issues relate to whether the NAAQS are arbitrary and capri-
cious. See NRDC v. EPA, 902 F.2d 962, 969, 971 (D.C. Cir. 
1989). The Constitution requires that Congress articulate 
intelligible principles; Congress has done so here.

 A final point. Unlike OSHA, which Lockout/Tagout I 
recognized has authority to reach into every workplace to 
dictate what is safe, to impose extensive civil and criminal 
penalties, and "to decide which firms will live and which will 
die," Lockout/Tagout I, 938 F.2d at 1318, EPA regulates 
primarily by setting standards for states to develop their own 
plans. See 42 U.S.C. s 7401(a)(3) (Congress finds "that air 
pollution prevention ... and air pollution control at its source 
is the primary responsibility of States and local govern-
ments."). Indeed, because states have three years to submit 
implementation plans, which are themselves subject to notice, 
comment, public hearing, and frequent renegotiation, we will 
not know for years precisely how the ozone and particle 
NAAQS will actually affect individual businesses. Only if a 
state fails to produce an acceptable plan can EPA terminate 
federal highway funds or impose its own implementation plan. 
Because the Clean Air Act gives politically accountable state 
governments primary responsibility for determining how to 
distribute the burdens of pollution reduction and therefore 
how the NAAQS will affect specific industries and individual 
businesses, courts have less reason to second-guess the speci-
ficity of the congressional delegation. Moreover, if the states 
disagree with the standards EPA has set, they have 535 
representatives in Congress to turn to for help. In fact, 
legislation to overturn the very NAAQS at issue in this case 
was introduced in the last Congress. See H.R. 1984, 105th 
Cong. (1997) ("A bill to provide for a four-year moratorium on 


the establishment of new standards for ozone and fine partic-
ulate matter under the Clean Air Act, pending further imple-
mentation of the Clean Air Act Amendments of 1990, addi-
tional review and air quality monitoring under that Act."); 
S. 1084, 105th Cong. (1997) ("A bill to establish a research 
and monitoring program for the national ambient air quality 
standards for ozone and particulate matter and to reinstate 
the original standards under the Clean Air Act, and for other 
purposes.").